UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| In re: | : | Case No. 17-34019-CMG |
| Kamuran Çörtük, | : | |
| Debtor. | : | |
|  | : | |
| Marina Cornelia Saita, Foreign Representative of the Bankruptcy Estate of Banca Turco Romana, | : | |
| Plaintiff, | : | Adv. Pro. No. 18-____-CMG |
| v. | : | |
| Kamuran Çörtük, | : | |
| Appellee. | | |

**COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT UNDER
11 U.S.C. § 523(A)(2), § 523(A)(4), AND § 523(A)(6), AND DISCHARGE OF
DEBTOR UNDER 11 U.S.C. § 727(A)(3), § 727(A)(4), AND § 727(A)(5)**

Marina Cornelia Saita (the "Liquidator"), in her capacity as foreign representative for the bankruptcy estate of Banca Turco Romana SA ("BTR"), recognized in that certain Chapter 15 case pending as Case No. 17-12995-AJC in the United States Bankruptcy Court for the Southern District of Florida, files this Complaint to determine the dischargeability of the Debt owed by Kamuran Çörtük (the "Debtor") to BTR under 11 U.S.C. § 523(a)(2), § 523(a)(4), and § 523(a)(6), and the discharge of Debtor under 11 U.S.C § 727(a)(3), § 727(a)(4)(A), and § 727(a)(5).

**JURISDICTION AND VENUE**

1.    This Bankruptcy Court has jurisdiction to hear and determine this matter pursuant to 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a), 28 U.S.C. 157(b)(1), and the General Order of

1

Reference entered on July 23, 1984 by the United States District Court for the District of New Jersey.

2.     This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I) & (J).

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

### ALLEGATIONS REGARDING IDENTIFICATION OF THE PARTIES AND THE DEBT

4.     Debtor, a Turkish citizen, filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on November 29, 2017 (the "Petition Date"). DE 1.

5.     BTR is a scheduled creditor of Debtor's bankruptcy estate for USD 134 million. DE 12 & 178.   The Liquidator has filed Proof of Claim No. 3-1 in the amount of USD 134,489,119.65 (the "Debt").

6.     The Debt is evidenced by a final Romanian judgment[1] (the "Judgment") against Debtor. Debtor's willful actions in his capacity as decision-maker and controller of BTR resulted in the Judgment against him, rendering him both criminally liable and jointly and severally civilly liable to pay BTR the Debt. By way of his criminal conviction, Debtor was found guilty of the instigation to the crime of abuse of office against public interest[2], and was ordered to serve a prison sentence of 13 years. The damages suffered by BTR are a direct result of Debtor's criminal actions. BTR further sets out the circumstances and actions of Debtor resulting in the Judgment below.

7.     All conditions precedent to the bringing of this action have been performed, waived, or excused.

---

[1] The case was first judged on the merits by the Bucharest Court of 1st District in 2007, and eventually rendered final on appeal on 25 May 2012.

[2] Stipulated by Art. 25 of the Romanian Criminal Code, related to Art. 248 of the Romanian Criminal Code, corroborated with Art. 248 of the Romanian Criminal Code, with the implementation of Art. 75 letter "a" of the Romanian Criminal Code.

## GENERAL ALLEGATIONS

I.    **Debtor Orchestrates an Illicit Scheme to Loot BTR**

### *Banca Turco Romana*

8.      BTR, a Romanian bank incorporated on December 22, 1993, offered, among other things, an international network of 270 correspondent banks in other countries, including Turkey.

9.      BTR provided, among other things, the management of saving, deposit and checking accounts, personal and corporate lending, trade finance, brokerage, and foreign exchange/money transfer services.

10.     BTR's operations and management were located in Romania.  At the height of its operations, BTR had over 50,000 banking customers, over 650 employees, and an approximate 4.4% share of the Romanian banking market, holding deposits valued in excess of USD 260 million and other banking assets in excess of USD 375 million.

### *Debtor's Control of BTR*

11.     Debtor exercised decision-making power and control over BTR by way of his ownership and control of the Bayindir Group, which consisted of a group of Turkish companies with operations in finance, health, construction and other industries.  The Bayindir Group included Bayindir Holding A.S. ("Bayindir Holding"), which at all relevant times was the majority shareholder of BTR and Bayindir Insaat Turizm Ticaret ve Sanayi A.S. ("Bayindir Turizm"), also a shareholder of BTR and the majority shareholder of Bayindir Holding.

12.     From the time of BTR's incorporation until its insolvency, the Bayindir Group owned a majority interest of BTR.  Specifically, in 1993, the Bayindir Group held 80% of BTR's shares. By June 1998, the Bayindir Group held 93.6% of BTR's shares and Bayindir Holding held 63.5% of BTR's shares.

13.    At least during the period of February 1998 and October 2000 (the "Relevant Period"), Debtor owned and controlled the Bayindir Group, in his roles as president of Bayindir Turizm and as member of Bayindir Turizm's Board of Directors, and as president and Chairman of the Board of Directors of Bayindir Holding.

14.    During the Relevant Period, Debtor was also a member of the BTR Board of Directors and an administrator of BTR.

15.    Debtor's ownership and control of the Bayindir Group during the Relevant Period, particularly over Bayindir Turizm and Bayindir Holding, permitted Debtor to exercise control over BTR and its business, including the power to order and direct the employment of account assets and securing of loans.

### *Debtor Orchestrated an Illicit Scheme to Loot BTR in Favor of the Bayindir Group*

16.    During the Relevant Period, Debtor caused BTR to pledge its assets to guarantee loans and extend fiduciary credits (together, the "Loans") made by foreign banks to Bayindir Turizm totaling USD 108 million and EUR 14.8 million.  The Loans were made by five (5) of BTR's correspondent banks, Es  Bank AG Vienna ("EsBank"), Finansbank Geneva, Suisse and Amsterdam, Holland branches ("Finansbank"), Banque Francaise de L'Orient Geneva ("Banque Francaise"), Demirbank – Malta and Bahrain branches ("Demirbank") and Dinamic Bank Offshore Ltd Lefkosa, Northern Cyprus ("Dinamic Bank", and collectively, the "Lending Banks").

17.    During the Relevant Period, Bayindir Turizm was experiencing severe financial difficulties and had no ability to satisfy the Loans made to it by the Lending Banks.

18.    During the Relevant Period, Debtor improperly used his power and influence over the other members of BTR's Board of Directors and officers, including its Presidents and Vice Presidents (the "Officers") to cause BTR to make deposits in the Lending Banks (the

4

"Guarantee/Fiduciary Deposits") totaling USD 108 million and EUR 14.8 million to serve as collateral/financing sources for BTR's guarantees/extensions of the Loans.

### *BTR Guarantees Demirbank's Loans to Bayindir Turizm*

19.    Between June and July 1999, BTR at the behest of the Debtor entered into fourteen (14) contracts with Demirbank agreeing to provide as collateral its placements in money market accounts as guarantees for the Loans made by Demirbank to Bayindir Turizm, as follows:

a.  On June 23, 1999, BTR entered into a guarantee agreement with Demirbank – Bahrain branch authorizing Demirbank to liquidate BTR's USD 4 million investment in a money market account as guarantee for a USD 4 million Loan;

b.  On June 24, 1999, BTR entered into a guarantee agreement with Demirbank – Bahrain branch authorizing Demirbank to liquidate BTR's USD 5 million investment in a money market account as guarantee for a USD 5 million Loan;

c.  On June 29, 1999, BTR entered into a guarantee agreement with Demirbank – Malta branch authorizing Demirbank to liquidate BTR's USD 5 million investment in a money market account as guarantee for a USD 5 million Loan;

d.  On June 30, 1999, BTR entered into a guarantee agreement with Demirbank – Malta branch authorizing Demirbank to liquidate BTR's USD 5 million investment in a money market account as guarantee for a USD 5 million Loan;

e.  On July 2, 1999, BTR entered into a guarantee agreement with Demirbank – Malta branch authorizing Demirbank to liquidate BTR's USD 2 million investment in a money market account as guarantee for a USD 2 million Loan;

f.  On July 8, 1999, BTR entered into a guarantee agreement with Demirbank – Bahrain branch authorizing Demirbank to liquidate BTR's USD 1 million investment in a money market account as guarantee for a USD 1 million Loan;

g.  On July 9, 1999, BTR entered into a guarantee agreement with Demirbank – Malta branch authorizing Demirbank to liquidate BTR's USD 2.15 million investment in a money market account as guarantee for a USD 2.15 million Loan;

h. On July 15, 1999, BTR entered into a guarantee agreement with Demirbank – Malta branch authorizing Demirbank to liquidate BTR's USD 3.8 million investment in a money market account as guarantee for a USD 3.8 million Loan;

i. On July 19, 1999, BTR entered into a guarantee agreement with Demirbank – Bahrain branch authorizing Demirbank to liquidate BTR's USD 3 million investment in a money market account as guarantee for a USD 3 million Loan;

j. On July 19, 1999, BTR entered into a guarantee agreement with Demirbank – Malta branch authorizing Demirbank to liquidate BTR's EUR 3.3 million investment in a money market account as guarantee for a EUR 3.3 million Loan;

k. On July 19, 1999, BTR entered into a guarantee agreement with Demirbank – Malta branch authorizing Demirbank to liquidate BTR's EUR 3 million investment in a money market account as guarantee for a EUR 3 million Loan;

l. On July 21, 1999, BTR entered into a guarantee agreement with Demirbank – Bahrain branch authorizing Demirbank to liquidate BTR's USD 4 million investment in a money market account as guarantee for a USD 4 million Loan;

m. On July 21, 1999, BTR entered into a guarantee agreement with Demirbank – Malta branch authorizing Demirbank to liquidate BTR's EUR 500,000 investment in a money market account as guarantee for a EUR 500,000 Loan; and

n. On July 21, 1999, BTR entered into a guarantee agreement with Demirbank – Malta branch authorizing Demirbank to liquidate BTR's DEM 4 million investment in a money market account as guarantee for a DEM 4 million Loan.

20. In total, BTR made Guarantee Deposits with Demirbank totaling USD 34.95 million, EUR 6.8 million and DEM 4 million (equivalent of EUR 2 million).

21. Under the guarantee contracts entered into by BTR with Demirbank, Demirbank had the right to liquidate any BTR Guarantee Deposit that secured a Demirbank Loan if the beneficiary Bayindir Group entity, i.e. Bayindir Turizm, defaulted on such Demirbank Loan.

22. The guarantee agreements with Demirbank were concealed from BTR's accounting, treasury, and internal control departments. Therefore, the Guarantee Deposits held by BTR in Demirbank continued to be reflected in BTR's records as "time deposits."

6

23.    Though Demirbank Loans were significant, no Bayindir Group entity made a formal request to BTR to guarantee the Demirbank Loans.

24.    BTR did not obtain any commission, payment or any form of consideration from any Bayindir Group entity in exchange for guaranteeing the Loans made by Demirbank.

### BTR also Guarantees the Loans Assigned to Dinamic Bank by Demirbank

25.    Bayindir Turizm failed to repay the Demirbank Loans by their maturity dates in July and August 2000. To avoid the foreclosure of BTR's Guarantee Deposits by Demirbank, in September 2000, the Debtor caused BTR to enter into four (4) contracts with Dinamic Bank whereby the Demirbank Loans were transferred to Dinamic Bank and extended until November 2000 and the Guarantee Deposits, totaling USD 35 million and EUR 8.8 million, were transferred to Dinamic Bank, as follow:

a.  On September 4, 2000, BTR entered into a guarantee agreement with Dinamic Bank guaranteeing Loans to Bayindir Turizm totaling USD 22 million (corresponding to loans described at para. 19a, b, d, f, i, and l) authorizing Dinamic Bank to liquidate on November 6, 2000, BTR's USD 22 million investment transferred on October 4, 2000 in a money market account with Dinamic Bank;

b.  On September 4, 2000, BTR entered into a guarantee agreement with Dinamic Bank guaranteeing a Loan to Bayindir Turizm totaling EUR 3 million (corresponding to the loan described in para. 19k) authorizing Dinamic Bank to liquidate BTR's EUR 3 million investment transferred on October 4, 2000 in a money market account with Dinamic Bank;

c.  On September 29, 2000, BTR entered into a guarantee agreement with Dinamic Bank guaranteeing Loans to Bayindir Turizm totaling USD 13 million (corresponding to the loans described in para.19c, e, g, and h) authorizing Dinamic Bank to liquidate BTR's USD 13 million investment transferred on October 31, 2000 in a money market account with Dinamic Bank; and

d.  On September 29, 2000, BTR entered into a guarantee agreement with Dinamic Bank guaranteeing Loans to Bayindir Turizm totaling EUR 5.8 million (corresponding to the loans described in para. 19j, m and n) authorizing Dinamic

Bank to liquidate BTR's EUR 5.8 million investment transferred on October 31, 2000 in a money market account with Dinamic Bank.

26.     The guarantee agreements with Dinamic Bank were concealed from BTR's accounting, treasury, and internal control departments. Therefore, the Guarantee Deposits held by BTR in Dinamic Bank continued to be reflected in BTR's records as "time deposits."

### *BTR Guarantees Finansbank's Loans to Bayindir Turizm*

27.     Between February 1998 and August 1999, at the behest of the Debtor, BTR entered into three (3) contracts with Finansbank to guarantee Loans made by Finansbank to Bayindir Turizm for the total amount of USD 14 million, as follows:

   a.  On February 4, 1998, BTR entered into a guarantee agreement to pledge a time deposit of USD 4 million made by BTR in Finansbank - Geneva branch on February 3, 1998, as guarantee for a USD 4 million Loan;

   b.  On August 4, 1999, BTR entered into a guarantee agreement with Finansbank – Amsterdam branch to pledge BTR's money market investment of USD 7 million as collateral for a USD 7 million Loan;

   c.  On August 10, 1999, BTR entered into an agreement with Finansbank – Amsterdam branch to pledge BTR's money market investment of USD 3 million as collateral for a USD 3 million Loan.

28.     Under the pledge contracts entered into by BTR with Finansbank, Finansbank had the right to liquidate any BTR Guarantee Deposit that secured a Finansbank Loan if the beneficiary Bayindir Group entity, i.e. Bayindir Turizm, defaulted on such Finansbank Loan.

29.     The guarantee agreements with Finansbank were concealed from BTR's accounting, treasury, and internal control departments. Therefore, the Guarantee Deposits held by BTR in Finansbank continued to be reflected in BTR's records as "time deposits."

30.     Though the Finansbank Loans were significant, no Bayindir Group entity made a formal request to BTR to guarantee the Finansbank Loans.

31.    BTR did not obtain any commission, payment or any form of consideration from any Bayindir Group entity in exchange for guaranteeing the Loans made by Finansbank.

### *BTR Guarantees Esbank's Loans to Bayindir Turizm*

32.    During August 1999 and May 2000, at the Debtor's behest, BTR entered into seven (7) guarantee contracts with Esbank to guarantee Loans made by Esbank to Bayindir Turizm totaling USD 19 million and EUR 6 million, as follows:

a.    Between August and September 1999, BTR entered into five (5) guarantee contracts with Esbank totaling USD 14 million and EUR 6 million to guarantee Loans made by Esbank to Bayindir Turizm; and

b.    On May 4 and 5, 2000, BTR entered into two (2) pledge contracts in the amount of USD 5 million to guarantee Loans made by Esbank to Bayindir Turizm.

33.    Under the guarantee contracts entered into by BTR with Esbank, Esbank had the right to liquidate any BTR Guarantee Deposit that secured an Esbank Loan if Bayindir Turizm defaulted on such Esbank Loan.

34.    The pledge contracts with Esbank were concealed from BTR's accounting, treasury, and internal control departments.  Therefore, the Guarantee Deposits held by BTR in Esbank continued to be reflected in BTR's records as "time deposits" with the monthly extension of the investments and collection of interests until the maturities of Esbank Loans to Bayindir Turizm, which were due on or about November 13, 2000.

35.    Though the Esbank Loans were significant, no Bayindir Group entity made a formal request to BTR to guarantee the Esbank Loans.

36.    BTR did not obtain any commission, payment or any form of consideration from any Bayindir Group entity in exchange for guaranteeing the Loans made by Esbank.

### *BTR Finances Loans Made by Banque Francaise's to Bayindir Turizm*

37.    Between December 1999 and February 2000, at the Debtor's behest, BTR entered into three (3) contracts with Banque Francaise to extend Loans through Banque Francaise to Bayindir Turizm for the total amount of USD 40 million, as follows:

  a.   On December 28, 1999, BTR transferred in its foreign currency account with Banque Francaise USD 10 million to create two time deposits that carried a yearly interest rate of 12% per year;

  b.   On January 18, 2000, BTR transferred in its foreign currency account with Banque Francaise USD 15 million to create a time deposit that carried a yearly interest rate of 12% per year; and

  c.   On February 1, 2000, BTR transferred in its foreign currency account with Banque Francaise USD 15 million to create a time deposit that carried a yearly interest rate of 12% per year.

38.    The fiduciary contracts with Banque Francaise were concealed from BTR's accounting, treasury, and internal control departments.  Therefore, the Fiduciary Deposits held by BTR in Banque Francaise continued to be reflected in BTR's records as "time deposits."

39.    Though the Loans extended by BTR through Banque Francaise were significant, no Bayindir Group entity made a formal request to BTR for fiduciary extension of the Loans.

40.    BTR did not obtain any commission, payment or any form of consideration from any Bayindir Group entity in exchange for extending the Loans through Banque Francaise.

### *The Bayindir Group Fails to Honor its Debts with Lending Banks and Causes BTR's Insolvency*

41.    When Bayindir Turizm failed to pay the amounts owed under the Loans, the Lending Banks foreclosed on the Guarantee Deposits and the fiduciary credits extended by BTR were not reimbursed, causing BTR to suffer a total loss of USD 108 million and EUR 14.8 million.

42.    As none of the Guarantee/Fiduciary Deposits made with the Lending Banks was disclosed to BTR's accounting, treasury or internal control departments, BTR's books and records did not accurately reflect the guarantee/financing obligation of BTR with respect to the Loans.

43.    Consequently, the financial statements of BTR inaccurately reported the Guarantee/Fiduciary Deposits as "Time deposits in banks" although they represented collateral deposits/fiduciary credits created by BTR in the Lending Banks to guarantee/extend the Loans made for the benefit of Bayindir Turizm.

44.    Unsurprisingly, BTR's monthly financial reports generated and delivered to the National Bank of Romania also failed to disclose that the Guarantee/Fiduciary Deposits were collateral deposits and fiduciary credits as opposed to time deposits.

45.    The commitment of the Guarantee/Fiduciary Deposits to the Lending Banks overexposed BTR in a manner that exceeded the exposure limits set forth by the National Bank of Romania.  Specifically, BTR's over commitment of liquid assets to guarantee/extend the Loans prevented BTR from meeting the minimum compulsory reserve levels set forth by the National Bank of Romania.

46.    The dramatic decrease of liquid assets experienced by BTR impeded it from being able to fully pay liquid and eligible receivables within 30 days, ultimately placing BTR in an insolvent position as a matter of Romanian Law (specifically under, article 2(1)(a) of Law no. 83/1998 on credit institutions' bankruptcy).

47.    In sum, once the true nature of the Guarantee/Fiduciary Deposits was exposed, BTR's liquidity crisis became unsurmountable and caused BTR to be formally placed in bankruptcy on July 3, 2002 by the Bucharest Court at the request of the National Bank of Romania made on May 16, 2002.

11

48.    As a result, as of December 31, 2002, BTR was damaged in the amount of USD 59,421,921.04 and EUR 11,326,199.99 (interest included), which was directly caused by Debtor's illicit scheme willfully orchestrated to loot BTR in favor of Bayindir Turizm.

49.    On April 19, 2007, the District Court of the District 1 Bucharest sentenced Debtor to 13 years in prison for his actions in connection with BTR's transfer of the Guarantee/Fiduciary Deposits and BTR's bankruptcy.

## II.    Debtor Engaged in Systematic Concealment of Assets through Corporate Vehicles

50.    In addition to the Loan Frauds detailed above, at least since 1999, Debtor engaged in various financial schemes to conceal and launder tens of millions of dollars looted from BTR. Inexplicably, Debtor now claims to possess only a modest 10,000 worth of property and appears incapable of providing complete disclosure of his financial affairs and recent history of material business transactions.

### *Corporate Entities Employed by Debtor*

51.    Debtor employed the use of various wealth management firms to assist Debtor in the creation of corporate structures for the purpose of concealing and laundering ill-gotten gains acquired through the Loan Frauds.

52.    In 1999, while Debtor orchestrated the Loan Frauds to BTR, Debtor became a client of a Swiss wealth management firm named NWT Management S.A. ("NWT"). NWT thereafter, and at all relevant times, engaged the services of a U.K. corporate services provider named Vicena International Limited ("Vicena").

53.    In September 1999, NWT and Vicena, at the request of Debtor or his representatives:

      a. formed a British Virgin Islands ("BVI") corporation named Rowena Ventures Limited ("Rowena");

b.  acquired the shares of Westpoint Industries Limited ("Westpoint UK") a previously registered "on-the-shelf" corporation held and managed by Vicena; and

c.  by way of a nominee agreement, Rowena entered into an "Agency Agreement" with Westpoint UK whereby Westpoint UK, which was ultimately owned by Rowena, and operated at all relevant times as Rowena's agent.

54.    In addition to Rowena and Westpoint UK, the Debtor utilized a series of companies to further conceal and obfuscate his assets, as follows:

a.  Westpoint USA, Inc. ("Westpoint USA"): a New Jersey corporation, wholly owned by Westpoint UK, formed for the benefit of the Debtor and managed by his son, Serkan Cortuk ("Serkan");

b.  Tempus Foundation ("Tempus"): a Liechtenstein foundation beneficially owned by the Debtor that received funds derived from the Real Estate Frauds, as presented below;

c.  Teneo Holdings Ltd ("Teneo"): a Maltese company owned by Tempus and beneficially owned by the Debtor which, following a suspicious transfer from Rowena, became the owner of the controlling interest in the Bayindir Group subsidiary most closely involved in the Real Estate Frauds;

d.  Piedmont Investment Ltd ("Piedmont UK"): a UK company owned by Teneo and beneficially owned by Debtor which, owned a real estate asset in Romania;

e.  Piedmont Investments SRL ("Piedmont Romania"): a Romanian company owned by Piedmont UK and beneficially owned by Debtor which is the direct owner of a real estate asset in Romania; and

f.  Flohr Worldwide Investments Ltd ("Flohr"): a BVI company beneficially owned by the Debtor that received funds derived from the Real Estate Frauds.

55.    Since December 2015, Dominion Fiduciary Services Ltd. ("Dominion") acted as Debtor's wealth manager.

56.    Tempus and the companies that are beneficially owned by Debtor, as displayed below, are hereinafter described as the "Tempus Corporate Structure."

**Kamuran Cortuk**

### *The BTR/Bayindir Real Estate Transaction*

57.     During the late 1990s, Debtor obtained millions of dollars from BTR by selling an office block and applying the proceeds to the purchase of land that had potential for significant development.[3]

58.     In August 1997, BTR purchased an office block located in Romania from Bayindir Lido Tourism and Commercial Investments SA, a Bayindir Group company that was owned by Debtor, for USD 8.8 million.

59.     Debtor used such proceeds to acquire an undeveloped piece of real estate in Stefanesti suburb of Bucharest, Romania (the "Stefanesti Land") that had significant potential for development.

60.     As of 2002, Bayindir Holding reported the value of the Stefanesti Land to be approximately USD 40 million.

61.     During the ensuing years, Debtor transferred the ownership of the Stefanesti Land among his various corporate vehicles, including Rowena and Teneo, with the assistance of his business associates, Hasim Bora Ozerman ("Ozerman") and Ahmet Emre Buyukhanli.

62.     As a result of these transactions, at least as of 2010, Debtor pocketed at least EUR 10 million by liquidating part of the Stefanesti Land and retained a significant portion of the Stefanesti Land (the "Stefanesti Land 1") through Piedmont Romania.

---

[3] The Liquidator believes that through this insider transaction, the Debtor caused BTR to massively overpay for the real estate.

14

*Acquisition of Life Insurance and Further Transfers to Investment Vehicles*

63.    Debtor used some of the proceeds resulting from the Stefanesti transactions to make further investments.  On November 2007, Debtor used the proceeds to purchase a life insurance policy valued at approximately EUR 2.5 million on April 2011.

64.    Shortly thereafter, Debtor used the rest of the funds acquired from Teneo to make two further transfers in May 18, 2011.  One transfer was to Doris Trade and Investment, Ltd. ("Doris Trade"), an entity specializing in the investment of gold bullion, gemstones and commodities, for USD 529,000.  The other transfer was to Sidarlia Trading SA, a Panamanian company (also specializing in gemstone trading) for USD 138,000.

*Several Consulting Agreements Pocket Debtor Millions of Dollars*

65.    In addition to the Loan Frauds and the Stefanesti transactions, during 2000 to 2012, Debtor employed the use of sham consulting agreements to launder funds among his companies (collectively, the "Consulting Frauds").

66.    To conduct the Consulting Frauds, Debtor was assisted by his longtime business associate, Ozerman, his personal lawyer, Noyan Savas, and his wealth managers.

67.    Each consulting agreement entailed the production of a sham invoice to obtain "commission" from one Debtor controlled entity to another.  In all instances, the receiving company never performed any services.

68.    The Consulting Frauds permitted Debtor to transfer approximately USD 5 million among his own companies for the purpose of placing assets outside the reach of BTR and others creditors.

III.    **Debtor Failed to Disclose Material Information and Lied Under Oath During this Bankruptcy Case**

69.     Notwithstanding Debtor's extensive (and allegedly successful) business experience, during the course of this Bankruptcy Case, Debtor has provided minimal information regarding his financial affairs, has not been forthcoming regarding all but a few transactions made for the past three years, and has concealed information regarding his corporate vehicles and the assets held by such vehicles.

70.     Debtor's unwillingness to provide any information regarding his financial affairs has put a significant burden on the Chapter 7 Trustee (the "Trustee") and BTR, Debtor's biggest creditor, to reconstruct Debtor's financial affairs and business records.

71.     On December 18, 2017, Debtor filed his initial Schedules of Assets and Liabilities ("Initial Schedules") and Statement of Financial Affairs ("Initial SOFA"). DE 12. Debtor amended his Schedules and Statement of Financial Affairs on two separate occasions. As further explained below, each amendment was made to include assets, liabilities or transactions only after they were inquired about by the Liquidator or the Trustee.

72.     The Debtor's Creditors Meeting was held on three separate sessions. Though the initial session was administrative, the first substantive session took place on April 30, 2018 (the "First 341 Session"). The second session occurred on October 25, 2018 (the "Second 341 Session").

73.     Given the lack of information provided by Debtor regarding his financial affairs, any new material piece of information that was relevant to Debtor's financial picture was either obtained by Liquidator or Trustee or disclosed by Debtor only after the Liquidator or the Trustee made inquiry.

***Debtor Concealed Transfers Made to his Children***

74.    Debtor's Initial Schedules list Debtor's total assets in the modest amount of 10,589 and liabilities in an amount exceeding 134 million. Debtor's Initial Schedules only list estimated unliquidated tax liability, credit card debt totaling approximately USD 4,300 and the BTR judgment totaling USD 134 million.  Debtor also listed unliquidated debts to Rowena[4] and Westpoint UK, however the Initial Schedules do not describe the nature of the debt.

75.    Debtor's Initial SOFA did not disclose any payments made on a debt owed to an insider, or transfers of any property that benefitted an insider.  DE 12.  Further, Debtor did not disclose any gift or property to anyone within 2 years before the Petition Date. DE 12.

76.    Shortly after the Initial Schedules were found, BTR advised the Trustee that Debtor had failed to disclose significant transfers totaling over USD 500,000 to his children, Serkan and Yesim Sakarya ("Yesim").

77.    Thereafter, the Trustee raised these transfers to Debtor's counsel, who also represents Yesim and Serkan, and discussed the prospect of filing claims against Serkan and Yesim for fraudulent transfers received from Debtor.

78.    After it became clear that Trustee became aware of the transfers to Yesim and Serkan, on April 27, 2018, Debtor amended his Schedules ("First Amended Schedules") and SOFA ("First Amended SOFA"). DE 109.

79.    Debtor's First Amended SOFA reflected a transfer made to Yesim of USD 264,201 and a series of transfers made to Serkan, the Debtor's son, totaling USD 259,250, made within a year of the Petition Date. DE 109.

---

[4] Debtor could not remember why he even listed Rowena as a creditor in his Initial Schedules. Tr. at 172:5-8 ("I don't remember why we put Rowena Ventures.").

80.     The transfers made by Debtor to his children were the biggest transactions reflected in his bank accounts at Bank of America ("BoA") and Valley National Bank ("Valley") within the past three years, yet he failed to list them.

81.     As of the Petition Date, and as of the filing of the Initial Schedules, Debtor knew of the transfers made to his children, as these were the biggest transfers made from his disclosed bank accounts, yet Debtor failed to disclose the transfers.

82.     Debtor's failure to include the transactions to his children in his Initial SOFA was not an honest mistake.  Rather, the concealment of such transfers was a deliberate act by Debtor to protect his children from inquiry or suit.

83.     Given Debtor's inability to provide truthful disclosure regarding his financial affairs, it is highly unlikely that Debtor has made complete disclosures regarding his financial affairs or, in the alternative, has satisfactorily explained the massive loss of his assets.

### *Debtor Concealed a Purported Debt Owed to Yesim Until It Became Necessary for Litigation Tactics*

84.     Though Debtor's Initial Schedules did not include any debt owed to Yesim, Debtor's First Amended Schedules were filed at a time when Yesim's standing in this Bankruptcy Case was being litigated.  Only then, did Debtor claim Yesim was a creditor of the Debtor.

85.     Shortly after the Petition, on December 12, 2017, the Liquidator filed a Motion for Relief from Stay to continue enforcement proceedings in the UK and Switzerland against Debtor and his assets, which Debtor, Yesim and Serkan opposed fiercely.  DE 10, 24, 30, 31 & 32.

86.     During the litigation regarding the stay relief sought, counsel for the Liquidator argued that neither Yesim nor Serkan had standing to contest the stay relief sought because they did not have a pecuniary interest.

87.    On February 14 and 15, 2018, the Court granted the stay relief sought by the Liquidator by way of two orders (the "Stay Relief Orders"). DE 10, 45 & 46. Debtor, Yesim and Serkan appealed shortly thereafter. DE 57 & 62.

88.    Anticipating litigation regarding her standing in this Bankruptcy Case, on March 2, 2018, Yesim filed Proof of Claim no. 2 for USD 29,656 for purported loans to fund Debtor's legal fees with respect to Debtor's litigation against BTR in Switzerland.

89.    Subsequently, Debtor scheduled Yesim's debt in his First Amended Schedules in the same amount as Yesim's proof of claim.

90.    Indeed, the appellate papers filed by Debtor, Yesim and Serkan, including the initial brief appealing the Stay Relief Orders, allege that Yesim has standing to appeal as a creditor of Debtor. Civ. No. 3:18-cv-2626, DE 2, D.N.J.

91.    Debtor's failure to include Yesim's debt in his Initial Schedules was not an honest mistake . Debtor testified in his First 341 Session that he and Yesim agreed prior to the Petition Date as to the amount of the funds Debtor owed Yesim for the payment of such legal fees. First 341 Tr. at 183:21–184:3, attached hereto as **Exhibit "A"**. However, about a month prior to his First 341 Session, which is the time in which the Liquidator contended that Yesim had no pecuniary interest with respect to the Stay Relief Motion, Debtor stated that Yesim said she had "made something wrong" and filed her proof of claim. First 341 Tr. at 185:1-8.

92.    Debtor's disclosure of Yesim's debt, for purported loans that had been agreed to by Debtor and Yesim, was made in an effort to clothe Yesim with standing with respect to the Stay Relief Appeal.

*Debtor Failed to Explain Substantial Transactions Reflected in his Bank Statements*

93.    During the First and Second 341 Sessions, Debtor failed to provide a scintilla of evidence or any explanation of his recent financial affairs and corporate interests, leaving the Trustee, the Liquidator and any other creditor with the nearly impossible and overly burdensome task of reconstructing his finances.

94.    Debtor testified that since he moved to the United States, Serkan managed his assets and record keeping and was in total control of them.

95.    Save for a few transfers, including a wire received from Yesim for USD 270,606.14 and a transfer to Serkan of USD 143,000.00, Debtor was unable to provide the purpose for or an explanation of any other transfer, stating that he did not know, that he could not remember, and/or that Serkan, who handled his finances made the transfer on his behalf and could provide further information.    In fact, in his First 341 Session, Debtor stated that Serkan "manages all [his] accounts" and that "he can do whatever he wants." Tr. at 255:20-256:9.

96.    In total, the Trustee inquired about eighty (80) individual transfers ranging from about USD 500 to 15,000, received or made from Debtor's BoA or Valley accounts.  The transfers were typically made to Serkan, Iron Bridge Constructors, Inc., and Yesim.  Examples of Debtor's responses include the following:

a.    When asked about a transfer in August 2015 from Westpoint USA to his BoA account, Debtor stated "I don't know.  We must check it.  We must ask my son because he knows all the details.  I don't know." Tr. at 255:20-256:5.

b.    When asked about a USD 1,500 transfer in February 2015 to his BoA account to Serkan, Debtor answered "[a]s I told you, when I opened account, I went and signed it.  All of the transactions are done by [Serkan] and he will answer all those questions if you ask him." Tr. at 263:8-14.

20

    c.   When asked about transfers of USD 9,500 and USD 5,500 in October 2016 from his BoA account to Iron Bridge Constructors, Inc.'s Valley account, Debtor responded, "I don't know, we will ask my son."

    d.   When asked about a USD 17,500 transfer made in February 2017 from Iron Bridge Constructors, Inc. to his Valley account, and a subsequent transfer on the same day of USD 9,500 from his Valley account to Serkan's account, Debtor responded, "I don't know. I don't remember, but [Serkan] will give – he will give you an answer that why we did these transaction." Tr. 287:21-289:4.

    e.   When asked whether he wired USD 6,000 made in February 2016 from his BoA account or whether Serkan did, Debtor responded, "everything is done by him. He took it, he put it he take it, he give USD 7,000, he take 6,000." Tr. 262:12-17.

    f.   With respect to all the wires made from his BoA and Valley accounts, Debtor noted all wires "is done by him." Tr. 262:18-21.

97.    Serkan did not provide any further explanation or documentation, however.

98.    Given Debtor's failure to provide any information as to transfers made to and from his BoA and Valley bank accounts, and based on his testimony that Serkan managed his accounts and had total control over the accounts, on August 17, 2018, the Liquidator served Serkan with a Fed. R. Bankr. P. 2004 Subpoena requesting information regarding significant transfers made from Debtor's BoA and Valley bank accounts.

99.    Serkan, however, moved to quash the subpoena, stating, among other things, that it requested the same information as the subpoena issued by the Liquidator on the Debtor. DE 155. After a hearing, the Court entered an Order ordering Serkan to respond to the Subpoena by October 23, 2018. DE 169.

100.    Serkan's response to the subpoena, dated October 23, 2018, stated that he had no further information or documentation other than what the Debtor had provided.

101.    As of today, Debtor has yet to provide any explanation justifying significant transfers made to and from his BoA and Valley bank accounts.

102.    As a result, Liquidator and Trustee are unable to determine purpose behind Debtor's

transfers.

### Debtor Failed to Explain Reason for Purported
### Dissipation of Investments to Doris Trade

103.    In the Second 341 Session, Debtor failed to explain the reason for a transfer made

from his bank account to Doris Trade for USD 529,000, stating, "I don't remember that company.

I don't know the reason." Second 341 Tr. at 153:24-155:4.

104.    As of today, Debtor has yet to provide any explanation explaining this transfer or

the dissipation of his investment in Doris Trade.

### Debtor Concealed his Beneficial Ownership of Real Property in Romania

105.    Debtor, testified that during the 10 years before the Petition Date no company in

which he had an interest, legal or equitable, beneficial owner or otherwise, owned any real estate.

First 341 Tr. at 65:5-12.

106.    Debtor also testified that during the 10 years before the Petition Date no company

in which he had an interest owned any other company that owned any real estate. First 341 Tr. at

65:12-18.

107.    These statements were false, as Debtor lied to conceal his beneficial ownership of

real property in Romania, the Stefanesti Land 1, which was acquired by Debtor's company and

concealed from BTR and Debtor's creditors by shuffling of ownership of the property among

Debtor's corporate vehicles.

108.    Further, Debtor's statement in his First 341 Session that he transferred Rowena to

Yesim prior to 2009 for no consideration because Rowena had no assets at the time is also untrue.

First 341 Tr. at 174:3-9; 178:1-16.

109.    Prior to transferring Rowena to Yesim, Rowena had significant assets as it held the Stefanesti Land. As described above, the Stefanesti Land was later partially liquidated by Rowena, and the remaining land, the Stefanesti Land 1, was transferred to Piedmont Romania.

110.    Debtor's failure to disclose that he owned the Stefanesti Land 1 and proceeds of the sale of portion of the Stefanesti Land through the Tempus Corporate Structure was made with the intent of preventing Trustee, the Liquidator and other creditors from discovering the truth regarding his ownership of the Stefanesti Land 1 and the proceeds of the sale of such property.

### *Debtor Concealed Other Assets Owned Through his Corporate Vehicles*

111.    Despite Debtor's admitted ownership of some business entities, Debtor stated in his Initial Schedules, First Amended Schedules, and Second Amended Schedules that he did not "own or have any legal or equitable interest in any business-related property." DE 12, DE 109, DE 178. In fact, Debtor stated in his First 341 Session that Tempus is "an empty company, shell company." Tr. at 198:4-7.

112.    Further, when asked he had any assets at the time he entered into the Confidential Settlement Agreement with BTR in late 2016, Debtor stated generally that the extent of his assets and of his companies' assets consisted of a EUR 3.5 million insurance policy he held personally and EUR 400,000 held in the bank account of one of the Tempus Corporate Structure entities.

113.    These statements under oath are false, however. As Debtor possesses interests in business related property through the Tempus Corporate Structure and other corporate vehicles.

114.    At least as of mid-2016, Ozerman liquidated part of the Stefanesti Land 1 property, generating approximately EUR 1.13 million for the benefit of Debtor, as further detailed below.

115.    In an email exchange between Dominion and Ozerman in November 2016, Dominion outlined how it could assist Debtor with his restructuring and tax advisory needs, to

assist Debtor in further concealing the assets held in the Tempus Corporate Structure, by, among

other things,

> realising liquidity in Piedmont Romania without exposing this liquidity to liabilities
> higher up the chain and to external creditors.  This is linked to the second issue in
> how best to wind down the existing structures in the most cost and tax effective
> basis as due to the investigation BTR is aware of their existence.

116.    In response, Ozerman replied by advising Dominion that he intends to transfer

Debtor some of the proceeds of the sale of the Stefanesti Land 1, as follows:

> As you may recall from the conversations we made in your premises early
> November, we would like to provide the transfer to Mr. C [Debtor] some funds that
> will be generated from the land sale in Romco [Piedmont Romania] … 1) What if
> the RomCo sells part of the lands in short-term (in a few weeks' time) and the
> collected cash is sent to Mr. C via the structure as a loan repayment? At this point,
> I would suggest: a) the RomCo pays fully back the Sh.Loan of EUR 292,411 to the
> UK Co [i.e. Piedmont UK], which then pays back partially its debt to Teneo … b)
> the RomCo makes a partial repayment of its debt to Teneo, which is over EUR 2
> mio, as far as I remember."

117.    In February 3, 2017, Ozerman advised Dominion over email that Piedmont

Romania has sufficient funds to pay Dominion's fees, as follows:

> I have been trying to arrange some cash funds, which are currently within the
> patrimony of the Romco [Piedmont Romania]; which I will first make a transfer to
> myself and then after withdrawing the funds in cash, I will arrange a transfer to
> your bank account via the daughter of Mr. C [Debtor] … She is the only source that
> can practically send you money (we did the same for paying our legal counsels
> BCCC Avocats)".

118.    On March 9, 2017, Ozerman advised that he had liquidated Piedmont Romania's

real property holdings, purportedly part of Stefanesti Land 1, for approximately EUR 1.13 million.

119.    Consequently, at least eight months prior to the Petition Date, Piedmont Romania,

an entity ultimately beneficially owned by Debtor, possessed at least EUR 1.13 million and the

unsold portion of the Stefanesti Land 1.

***Debtor Lied About Ozerman's Role as Operator of his Corporate Vehicles***

120.    In his First 341 Session, Debtor stated that Ozerman was a consultant that was not authorized to carry out his affairs. First 341 Tr. at 116:19-117:18. Specifically, Debtor stated that Ozerman was never authorized to do anything on behalf of any company in which he had an interest. First 341 Tr. at 117:23-118:4.

121.    Debtor's statements under oath were not true, however. Ozerman assisted the Debtor various transactions relating to the Stefanesti Land, is the nominal shareholder of Piedmont UK and Piedmont Romania, and participated in at least one Consulting Fraud of approximately EUR 1.25 million.

122.    Further, at Debtor's request, Ozerman was granted two separate powers of attorney by Piedmont UK in 2012 and 2016 to handle all the business affairs of Piedmont Romania.

***Debtor Lied About Yesim's Role as Operator of his Entities***

123.    Debtor also testified in his First 341 Session that Yesim was never authorized to act on his behalf to discuss any of his companies with Dominion.

124.    Again, Debtor lied under oath. On at least two separate occasions, Yesim contacted Debtor's wealth manager at Dominion's predecessor entity on behalf of the Debtor.

125.    On November 20, 2007, Yesim email Marie-France Nava, advising that Teneo had received EUR 10 million (as one of the contingent payment relating to the sale of a portion of the Stefanesti Land), and directing that EUR 2 million be transferred to Flohr and EUR 3 million be transferred to Debtor's bank account at Credit Suisse. In the same communication, Yesim notes that "[Ozerman] will discuss with Mr. C [Debtor] and share with you what to do with the remaining 5 million in [Teneo]'s account."

126. On November 30, 2007, Yesim requested two further transfers from Teneo's bank account. One transfer of EUR 500,000 to an unknown recipient and the second transfer of EUR 120,000 to Debtor's account at Credit Suisse.

### Debtor Concealed Existence of Turkish Pension Payments and Turkish Credit Card

127. Upon inquiry from the Trustee, Debtor disclosed for the first time in the First 341 Session that he had a pension from the government of Turkey that paid him USD 500 (about 2,000 Turkish Lira) per month. First 341 Tr. at 103:25-104:19.

128. Prior to Trustee's inquiry, Debtor had failed to disclose the pension payments in the Initial Schedules. Debtor also failed to list the pension payments in his First Amended Schedules. Debtor only disclosed the information in his Second Amended Schedules.

129. Per Trustee's request, Debtor provided the information for the bank to which the pension payments were deposited but did not disclose the identity of the person(s) who have withdrawn the funds from such bank account.

130. Notwithstanding Debtor's disclosure that he receives about USD 500 per month in pension payments, he failed to disclosed the identity of the person that receives the monthly funds, stating that the person "can be my old driver, my daughter, I don't know -- this is very, very small amount. I will never care what is going on ..." Tr. at 104:23-105:5.

131. Debtor's failure to disclose the identity of his pension funds was deliberate, as he sought to continue to conceal the identities of the individuals with access to his finances.

### Debtor Lied about Being Beneficiary of Fusun Gonen's Life Insurance Policy

132. Debtor lied about not being a beneficiary of an insurance policy held by Fusun Gonen ("Gonen") with Credit Suisse Life (Bermuda) Ltd. First 341 Tr. at 228:12-20; 233:15-21.

133.    On April 19, 2011, Gonen, with Debtor as co-signatory, purchased a life insurance policy from Credit Suisse Life (Bermuda) Ltd. for a premium of a USD 3.6 million ("Gonen Insurance Policy"). Debtor was a joint beneficiary of the Gonen Insurance Policy.

134.    In fact, in a sworn affidavit made to a court in the UK, Gonen confirmed that Cortuk was a beneficiary of the Gonen Insurance Policy, stating that "[a]s my parents were elderly and I did not have any children or siblings (and [Debtor] happened to be with me at the meeting), I ultimately decided to put down [Debtor]'s name, and eventually his children's names, because of my relationship with the Cortuk family I have described above)."

135.    Further, as stated in her sworn affidavit with the UK court, on November 12, 2012, Gonen requested a redemption of the Gonen Insurance Policy for USD 160,000 in favor of Teneo.

136.    The personal banker for Gonen and Debtor with Credit Suisse, noted in internal bank records, that Debtor would return the funds to Gonen by other means, as follows: "the BO of Teneo ist he [sic] boyfriend of the policy holder[.] They live together in Istanbul, Turkey. He is consolidating some assets in his Teneo account, but will give her similar amount in Turkey from his personal funds."

### Debtor Concealed Existence of Turkish Credit Card he has Been Using for at Least 20 Years

137.    Debtor also concealed a Turkish credit card that he had been using for about 20 to 30 years.

138.    As part of her investigations, the Liquidator learned during August 2018 that a few days after the Petition Date, Debtor filed a "Credit Card Authorization Form" with Forsgate Country Club—a country club frequented by Debtor for his frequent golf outings and entertainment—disclosed a credit card for a Turkish bank named Yapi Ve Kredi Bankasi, A.S. ("Yapi Bank").

139.    Debtor failed to disclose the Yapi Bank credit card in his Initial Schedules or his First Amended Schedules.

140.    During the Second 341 Session, Debtor testified that he owned the credit card for the past 20 to 30 years. Second 341 Tr. 91:15-19.

141.    Debtor further stated that his daughter, Yesim, pays the balance of the Yapi Bank credit card, and he stated that Yesim pays the credit card bills from her "pocket."  Second Tr. at 92:15-22, attached hereto as **Exhibit "B"**.

142.    Though Debtor stated that he would produce the statements for the Yapi Bank credit card for one year prior to the Petition Date, Debtor has yet to produce those statements.

143.    Again, Debtor's failure to disclose the bank statements for the credit card were deliberate, as Debtor admitted to regularly using the credit card and having it for the past 20 to 30 years.

### *Debtor's Concealment of Substantial Legal Proceedings against Him in Turkey*

144.    Per an order entered by the Court, Debtor issued letters to several of his agents, including his lawyer in Turkey requesting information of any proceedings against Debtor.

145.    On or about October 18, 2018, Debtor's counsel received a letter from Evrim Baykut Yasak, Debtor's Turkish lawyer, advising that Debtor is a defendant in three separate lawsuits (the "Turkish Lawsuits") seeking to recover from him a total amount of approximately USD 155.79 million plus interest, in connection with his guarantees of loans made to the Bayindir Group by Turkish banks during 2002, 2003 and 2005.

146.    Ms. Yasak further advises in her letter, "[t]hese litigations are not legally expected to end in the favor of Mr. Kamuran Cortuk, only the amounts may differ nonessentially."

147.    Debtor failed to list the Turkish Lawsuits in his Initial Schedules and SOFA, or in his First Amended Schedules and SOFA.

148.    During the Second 341 Session, Debtor stated that he did not recall before that there were lawsuits against and, "[m]y lawyers can know it, and they never inform me because I don't have any intention about it. I know that I am going to lose it, okay?" Second Tr. at 114:13-18.

149.    Though Debtor couches his failure to disclose the existence of the Turkish Lawsuits, it is evident, based on Debtor's position in various pleadings, that he has used such nondisclosure to his advantage.  On numerous pleadings, Debtor has stated that he has a pecuniary interest in this Bankruptcy Case because, in the event BTR's debt is discharged, and other events occur, he will have any purported surplus.  The addition of the Turkish Lawsuits belies Debtor's position with respect to standing.

## COUNT I

### EXCEPTION TO DICHARGE FOR FALSE PRETENSES
### AND ACTUAL FRAUD UNDER 11 U.S.C. § 523(A)(2)

150.    Liquidator realleges the allegations set forth in paragraphs 1 to 49 as if set forth herein.

*False Pretenses*

151.    As described in more detail above, Debtor exercised his control and influence over BTR and its fiduciaries to direct BTR's systematic guarantee/extension of the Loans made by the Lending Banks to Bayindir Turizm.  Debtor's procurement of BTR's guarantee/extensions of the Loans was made under false pretenses.

152.    Debtor, as owner and president of Bayindir Turizm, caused it to obtain the Loans under the false pretense that it would pay for the Loans.  In fact, Debtor intended for BTR to pay

for the Loans by way of the guarantee deposits and fiduciary credits BTR held/extended with the Lending Banks, as Debtor knew that Bayindir Turizm was in a condition of financial distress that would impede the payment of the short-term Loans and did not intend for Bayindir Turizm to pay for the Loans.

153.    Debtor also caused Bayindir Turizm to obtain the Loans under the false pretense that it would be the primary obligor on the Loans.  Rather, it intended for BTR to be the primary obligor for the Loans as BTR was guaranteeing/financing the Loans with its own pledged assets. At the time of the Loans, Debtor knew that Bayindir Turizm, which was in a condition of financial distress, would not be able to repay the Loans and did not intend for Bayindir Turizm to pay for the Loans.

154.    As further detailed above, Debtor exercised his influence and control over BTR and its fiduciaries to cause BTR to become the primary obligor and ultimately responsible for the Loans, as he was aware that Bayindir Turizm did not have the means nor did it intend to pay the the Loans.

155.    As Bayindir Turizm and Bayindir Group predictably failed to pay the Loans in full, BTR was unable to recover a significant portion of the Guarantee/Fiduciary Deposits and was forced into bankruptcy, suffering damages (interest included) in the amount of USD 59,421,921.04 and EUR 11,326,199.99.

*Actual Fraud*

156.    In the alternative, the acts described above constitutes an actual fraud under 11 U.S.C. § 523(a)(2)(A).

157.    As further detailed above, Debtor defrauded BTR by failing to disclose to BTR that Bayindir Turizm was in a condition of financial distress and unable to satisfy the Loans it incurred.

158.    As Bayindir Turizm and Bayindir Group predictably failed to pay the Loans in full, BTR was unable to recover a significant portion of the Guarantee/Fiduciary Deposits and was forced into bankruptcy, suffering damages (interest included) in the amount of USD 59,421,921.04 and EUR 11,326,199.99.

WHEREFORE, the Liquidator requests that this Court  (i) except BTR's judgment against Debtor in the amount of USD 59,421,921.04 and EUR 11,326,199.99, plus interest, costs, penalties, and fees, accruing since 31 March 2003, from any discharge granted to Debtor in this, or any future bankruptcy proceeding under 11 U.S.C. § 523(a)(2); and (ii) grant such other and further relief as the Court deems just and proper.

## COUNT II

### EXCEPTION TO DISCHARGE FOR FRAUD OR DEFALCATION IN FIDUCIARY CAPACITY, EMBEZZLEMENT AND LARCENY UNDER 11 U.S.C. § 523(A)(4)

159.    Liquidator realleges the allegations set forth in paragraphs 1 to 49 as if set forth herein.

*Embezzlement*

160.    As a member of BTR's board and as a holder of decision-making power and control over BTR, Debtor held a position of trust and confidence. This position of trust and confidence was further evidenced by his conviction of instigation of abuse of office, pursuant to which Debtor was deemed a person who exercises his duties in the interest of other institutions and persons of public interest. Debtor committed a breach and defalcation of his duties as a member of BTR's Board by directing and monitoring BTR's systematic guarantee/extension of the Loans made by the Lending Banks to Bayindir Turizm, to the detriment of BTR.

161.    At the time of BTR's guarantee/extension of the Loans, Debtor was unlikely to satisfy the Loans.

162.    During the Relevant Period, Debtor was in control of BTR through his ownership and control of the Bayindir Group.  During that period, the Bayindir Group held no less than 90% of shares in BTR.  Further, Debtor was a member of BTR's Board, and further held a position of control and decision-making power over BTR.  Consequently, Debtor was a fiduciary of BTR.

163.    During the Relevant Period, Debtor directed  (i) the entry into the guarantee agreements/fiduciary contracts by BTR with the Lending Banks to facilitate the acquisition of the Loans by the beneficiary entity of the Bayindir Group; (ii) that Bayindir Group never made a written request to BTR to guarantee/extend the Loans and never paid any consideration for BTR's guarantees/fiduciary extensions of the Loans; (iii) that BTR's Officers conceal the illiquid nature of the Guarantee/Fiduciary Deposits as "time deposits" as opposed to "collateral deposits/fiduciary credits" to hide the fact that BTR overcommitted itself to secure extensive loan obligations; (iv) that BTR generated financial reports to the National Bank of Romania failing to disclose the illiquid nature of Guarantee/Fiduciary Deposits; and (v) that Bayindir Turizm, as an entity in the Bayindir Group, obtained (with BTR's involvement) Loans in the amount totaling USD 108 million and EUR 14.8 million and failed to pay such Loans.

164.    As a direct result of Debtor's defalcation of his fiduciary duties to BTR as a member of BTR's board, BTR became liable for the debts of the Bayindir Group entity up to the amount of the Guarantee Deposits totaling USD 68 million and EUR 14.8 million and recorded non-performing fiduciary loans up to the amount of the Fiduciary Deposits totaling USD 40 million. As Bayindir Turizm and Bayindir Group failed to pay the Loans in full, BTR was unable to recover a significant portion of the Guarantee/Fiduciary Deposits and was forced into bankruptcy,

suffering damages (interest included) in the amount of USD 59,421,921.04 and EUR 11,326,199.99. As a result, Debtor effectively caused the misappropriation of assets he was entrusted with due to his position of control over BTR.

165.    Debtor's actions, resulting in his criminal conviction, as set forth above constitute defalcation while acting in a fiduciary capacity as provided in 11 U.S.C. § 523 (a)(4) and his obligations to BTR that have arisen as the result of his malfeasance are not subject to discharge.

*Embezzlement*

166.    As further explained above, Debtor possessed ultimate control over BTR's board as a member and as the owner and controller of Bayindir Group, which owned no less than 90% of BTR during the Relevant Period.

167.    Notwithstanding the fact that BTR, and its property, was under Debtor's control, Debtor caused BTR to enter into the guarantee agreements/fiduciary contracts with the Lending Banks to facilitate the acquisition of the Loans by the beneficiary entity of the Bayindir Group.

168.    Such appropriation was improper because, as further described above, at the time of BTR's guarantee agreements/fiduciary contracts with the Lending Banks, Debtor knew that the Bayindir Group was in a condition of financial distress and that it would be unable to pay back the Loans facilitated by BTR. Further, the Bayindir Group never made a written request to BTR to guarantee/extend the Loans and never paid any consideration for BTR's guarantees/fiduciary extensions of the Loans. As a result of the Loans, Bayindir Turizm, as an entity in the Bayindir Group, obtained (with BTR's involvement) Loans in the amount totaling USD 108 million and EUR 14.8 million and failed to pay such Loans.

169.    As Bayindir Turizm and Bayindir Group failed to pay the Loans in full, BTR was unable to recover a significant portion of the Guarantee/Fiduciary Deposits and was forced into

bankruptcy, suffering damages (interest included) in the amount of USD 59,421,921.04 and EUR 11,326,199.99.

*Larceny*

170.    Debtor's use of BTR's funds to secure Loans to one of his companies, thereby securing his ultimate benefit of the Loans provided by the Lending Banks to Bayindir Turizm constitutes larceny within the meaning of Section 523(a)(4).

WHEREFORE, the Liquidator requests that this Court (i) except BTR's judgment against Debtor in the amount of USD 59,421,921.04 and EUR 11,326,199.99, plus interest, costs, penalties, and fees, accruing since 31 March 2003, from any discharge granted to Debtor in this, or any future bankruptcy proceeding under 11 U.S.C. § 523(a)(4); and (ii) grant such other and further relief as the Court deems just and proper.

## COUNT III

### EXCEPTION TO DISCHARGE FOR WILLFUL AND MALICIOUS INJURY BY DEBTOR TO BTR UNDER 11 U.S.C. § 523(A)(6)

171.    Liquidator realleges the allegations set forth in paragraphs 1 to 49 as if set forth herein.

*Willful and Malicious Injury*

172.    As described above, Debtor willfully and deliberately caused injury to BTR because Debtor directed the acts of BTR's Officers that caused the relevant Bayindir Group entity to obtain the Loans.

173.    Debtor directed BTR's Officers to cause BTR to make the Guarantee/Fiduciary Deposits with the Lending Banks and to cause BTR to enter into guarantee agreements/fiduciary

contracts with the Lending Banks to facilitate the Bayindir Group's acquisition of the Loans, knowing that such transactions would greatly harm BTR.

174.    Specifically, Debtor knew that BTR making the Guarantee/Fiduciary Deposits would harm BTR because (i) BTR did not receive any consideration in exchange for the granting/extending of the Guarantee/Fiduciary Deposits; (ii) the transfers of the Guarantee/Fiduciary Deposits overcommitted BTR's liquid assets, leaving BTR's liquid reserves below the threshold set forth by the National Bank of Romania; and (iii) the Bayindir Group was in a distressed financial position that made the likelihood of repayment of the Loans very unlikely.

175.    Despite this knowledge, Debtor caused BTR to enter into guarantee agreements/fiduciary contracts with the Lending Banks to guarantee/extend the Loans that solely benefitted his companies.

176.    Debtor maliciously injured BTR because Debtor used his position of having control over both BTR and the Bayindir Group to use BTR as Bayindir Group's piggybank to guarantee/raise over USD 100 million in loans in full knowledge of the damage that such actions would cause to BTR.

177.    Debtor, who controlled Bayindir Group, knew that Bayindir Group did not make a formal request to BTR to assist it in obtaining the Loans.

178.    Debtor also knew that the Bayindir Group did not provide any consideration to BTR in exchange for the Guarantee/Fiduciary Deposits.

179.    Debtor was also aware that the Bayindir Group was not likely to pay the balance of the Loans as it was in a distressed financial condition and therefore had full knowledge of the risks created for BTR.

180.    Further, since Debtor was aware that the correct reporting of Guarantee/Fiduciary Deposits in BTR's financial statements would cause a significant liquidity crisis for BTR, Debtor directed BTR's Officers to conceal such information from BTR's accounting, treasury and internal control departments in order to further his scheme against BTR without hindrance.

181.    Without just cause or excuse, Debtor inflicted upon BTR an injury that was wrongful and malicious, which resulted in BTR suffering damages (interest included) in the amount of USD 59,421,921.04 and EUR 11,326,199.99.

WHEREFORE, the Liquidator requests that the Court (i) except BTR's judgment against Debtor in the amount of USD 59,421,921.04 and EUR 11,326,199.99, plus interest, costs, penalties, and fees, accruing since 31 March 2003, from any discharge granted to Debtor in this, or any future bankruptcy proceeding under 11 U.S.C. § 523(a)(6); and (ii) grant such other and further relief as the Court deems just and proper.

## COUNT IV

### EXCEPTION TO DISCHARGE FOR FAILURE TO KEEP OR PRESERVE RECORDED INFORMATION UNDER 11 U.S.C. §727(A)(3)

182.    The Liquidator realleges the allegations set forth in paragraphs 50-149 as if fully set forth herein.

183.    Debtor has failed to explain the overwhelming majority of transfers over USD 1,000 in his BoA and Valley accounts.

184.    Debtor has also failed to provide his bank statements for the Yapi Bank credit card, the recipient of the funds from his Turkish pension, and the identity of the person authorized to withdraw the monthly payments provided by his Turkish pension.

185.    Debtor has also failed to preserve any record or otherwise explain his investments in Doris Trade and Sidarlia.

186.    Additionally, Debtor has failed to provide any records regarding the Tempus Corporate Structure, the Stefanesti Land 1 property, and the recipients and status of the funds obtained by the sale of part of the Stefanesti Land.

187.    As Debtor has been incapable of explaining the foregoing material transactions that shed light into his financial affairs, the Liquidator and the Trustee are unable to ascertain the true financial condition of the Debtor.

188.    Liquidator and Trustee should not have the obligation to reconstruct Debtor's financial condition and the Court should not be required to speculate about Debtor's financial history or condition.

189.    Debtor's failure to produce the relevant books and records, and his inability to explain the above-mentioned transactions, make it impossible for the Liquidator and Trustee to ascertain Debtor's financial condition and material business transactions.

WHEREFORE, the Liquidator objects to the granting of a discharge to the Debtor and requests that the Court deny the Debtor's discharge and grant such other and further relief as the Court deems just and proper.


## COUNT V

### OBJECTION TO DISCHARGE FOR MAKING A
### FALSE OATH UNDER 11 U.S.C. §727(A)(4)(A)

190.    The Liquidator realleges the allegations set forth in paragraphs 50-149 as if fully set forth herein.

37

*False Statements Regarding Debtor's Property Interest in Stefanesti Land 1 and Proceeds of Same*

191.    Debtor made a false statement in the First 341 Session by denying that any company in which he had an interest owned any real estate in the ten years before the Petition Date.

192.    Further, in the First 341 Session, Debtor made the false statement that in later 2016, at the time he entered into the Confidential Settlement Agreement with BTR, that he only possessed a EUR 3.5 million insurance policy and EUR 400,000 in a company's bank account.

193.    Further, in his Initial Schedules, First Amended Schedules, and Second Amended Schedules, Debtor stated that he did not own or have any legal or equitable interest in any business-related property.

194.    As set forth in more detail above, Debtor was aware that at least as late as 2016, Piedmont Romania continued to own the Stefanesti Land 1 property, as was disclosed by Ozerman to Dominion.

195.    As set forth in more detail above, at the time, Ozerman intended to liquidate at least part of the Stefanesti Land 1 to submit the funds to Debtor.

196.    Debtor made the false statement with fraudulent intent, including the intent to conceal from the Trustee that he was the ultimately beneficiary of any valuable real estate property to avoid turning over the proceeds of the sale of the Stefanesti Land 1 or the ownership interest in any unsold portion of the same.

197.    As this Bankruptcy Case is presently a "no-asset" case, Debtor's false statement is material to this Bankruptcy Case because it prevents Trustee from capturing potential additional sources of revenue.

*Ozerman's Authorization to Act on Debtor's Behalf*

198.    In the First 341 Session, Debtor also made the false statement that Ozerman was never authorized to do anything on behalf of any company owned by Debtor.

199.    As set forth in more detail above, Ozerman was granted at least two powers of attorney to handle all affairs of Piedmont Romania, a company that is part of the Tempus Corporate Structure and is beneficially owned by Debtor.

200.    Debtor was aware of the Ozerman's authorization as Debtor himself requested that Ozerman be granted a power of attorney to manage the affairs of Piedmont Romania.

201.    Debtor made the false statement with fraudulent intent, including the intent to conceal from the Trustee that Ozerman had any knowledge related to the Real Estate Frauds and to conceal that Debtor was the ultimately beneficiary of Piedmont Romania's assets to avoid turning over the proceeds of the sale of the Stefanesti Land 1 or the ownership interest in any unsold portion of the same.

202.    Debtor's omissions are material to this Bankruptcy Case because they prevent the Trustee from capturing potential additional sources of revenue in this "no-asset" case and identifying further sources of discovery.

*Yesim's Authority to Act on Behalf of Debtor*

203.    In the First 341 Session, Debtor made the false statement that Yesim had never been authorized to act on his behalf to discuss any of his companies with Dominion.

204.    As stated in further detail above, Yesim had exchanged email communications with Debtor's wealth manager on at least two separate occasions, and instructed the wealth manager to execute transfers on behalf of Teneo, Debtor's company.

205.    Debtor was aware of Yesim's authority to act on his behalf as Yesim noted that it was at Debtor's request that she was making the instruction.

206.    Debtor made the false statement with fraudulent intent, including the intent to conceal Yesim's role with respect to the management of his various corporate entities and to shield Yesim from further investigations and potential litigation.

207.    The Debtor's omissions are material to this Bankruptcy Case because it prevents Trustee from capturing potential additional sources of revenue in this "no-asset" case and identifying further sources of discovery.

*Benefits Incurred from the Gonen Insurance Policy*

208.    In the First 341 Session, Debtor made the false statements that he was not a beneficiary of the Gonen Insurance Policy and that none of his companies had received funds redeemed from the Gonen Insurance Policy.

209.    As stated in further detail above, Debtor, who was a co-signator of the Gonen Insurance Policy and was present at the time of its execution, was aware that he would be a beneficiary of the Gonen Insurance Policy.

210.    Similarly, Debtor was aware that at least one of his companies, Teneo, would receive the proceeds from a partial policy redemption of the Gonen Insurance Policy funds totaling USD 160,000 as he promised to pay Gonen back the same sums.

211.    Debtor made the false statements with fraudulent intent, including the intent to conceal that he was a beneficiary in any way of the Gonen Insurance Policy.

212.    The Debtor's omissions are material to this Bankruptcy Case because it prevents Trustee from capturing potential additional sources of revenue in this "no-asset" case and identifying further sources of discovery.

*False Statements in Schedules and SOFA*

213.　During the Bankruptcy Case, Debtor failed to disclose the following:

　　a.　In his Initial SOFA, Debtor omitted transfers totaling over USD 500,000 within a year of the Petition Date to Serkan and Yesim;

　　b.　In his Initial Schedules and SOFA, First Amended Schedules and SOFA, and Second Amended Schedules and SOFA, Debtor omitted the Yapi Bank credit card;

　　c.　In his Initial Schedules and SOFA and First Amended Schedules and SOFA, Debtor omitted his pension fund payments from the Turkish government; and

　　d.　In his Initial Schedules and SOFA, Debtor omitted a purported debt owed to Yesim.

214.　Though Debtor corrected the aforementioned omissions in subsequent amended filings, such omissions were only disclosed after they were brought to the attention of Debtor by the Liquidator or Trustee.

215.　As set forth above, Debtor's omissions were made with fraudulent intent at a time when the Debtor knew of the omissions.

216.　The Debtor's omissions are material to this Bankruptcy Case because it prevents Trustee from capturing potential additional sources of revenue in this "no-asset" case and identifying further sources of discovery.

WHEREFORE, the Liquidator objects to the granting of a discharge to the Debtor and requests that the Court deny the Debtor's discharge and grant such other and further Relief as the Court deems just and proper.

## COUNT VI

### OBJECTION TO DISCHARGE FOR FAILURE TO EXPLAIN
### LOSS OF ASSETS OR DEFICIENCY OF ASSETS UNDER 11 U.S.C. § 727(A)(5)

217.    The Liquidator realleges the allegations set forth in paragraphs 50-149 above as if fully set forth herein.

218.    As stated above, Debtor has acquired significant assets over the past decade.  The Liquidator has identified the following: (i) the Stefanesti Land 1 valued at approximately EUR 10 million; (ii) the funds resulting from Ozerman's sale of part of the Stefanesti Land 1; (iii) the contingent payments totaling EUR 10 million in connection with the Opus Sale; (iv) the pension payments received from the Turkish government; and (v) several transfers from his BoA and Valley accounts to Serkan and Iron Bridge Constructors, Inc.

219.    Debtor has failed to admit that he owns several of these assets and has not provided any explanation for his failure to disclose these assets.

220.    Further, to the extent such assets were reinvested, such as in subsequent transfers to Doris Trade and Sidarlia, Debtor has failed to explain their purpose.

221.    Debtor has also failed to explain the loss of the aforementioned assets or deficiency of assets to meet Debtor's liabilities.

WHEREFORE, the Liquidator objects to the granting of a discharge to the Debtor and requests that the Court deny the Debtor's discharge and grant such other and further Relief as the Court deems just and proper.

Dated: December 21, 2018                    Respectfully submitted,

                                            SHERMAN, SILVERSTEIN, KOHL,
                                            ROSE & PODOLSKY, P.A.

308 Harper Drive, Suite 200
Moorestown, NJ  08057
Telephone: (856) 662-0700
Facsimile: (856) 773-5308

By:   */s/ Arthur J. Abramowitz*
Arthur J. Abramowitz

And

Gregory S. Grossman
Florida Bar No. 896667
SEQUOR LAW, P.A.
1001 Brickell Bay Drive, 9th Floor
Miami, Florida 33131
Telephone: 305-372-8282
Facsimile: 305-372-8202
E-Mail: ggrossman@sequorlaw.com

By:   */s/ Gregory S. Grossman*
Gregory S. Grossman
Florida Bar No. 896667
*Application for Admission*
*Pro Hac Vice Pending*


*Attorneys for the Liquidator*

\\ad-fs\Company\WDOX\CLIENTS\10258\3001\00296420.DOCX

43