**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - -X
In re:

KAMURAN CORTUK,                                    Chapter 7

                                                   Case No. 17-34019 (CMG)

          Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - -X
MARINA CORNELIA SAITA, Foreign
Representative of the Bankruptcy Estate
of BANCO TURCO ROMANA,                             Adv. Pro. No. 18-1651 (CMG)

          Plaintiff,

v.

KAMURAN CORTUK,

          Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - -X

**OPINION**

**APPEARANCES:**

**SHERMAN SILVERSTEIN**
**Arthur Abramowitz, Esq.**
and
**SEQUOR LAW**
**Gregory Grossman, Esq.**
Attorneys for Marina Cornelia Saita, Foreign Representative
of the Bankruptcy Estate of Banco Turco Romana, Plaintiff

**GIORDANO HALLERAN & CIESLA, P.C.**
**Donald C. Campbell, Esq.**
Attorney for Debtor/Defendant

**YESIM SAKARYA, Creditor**

**CHRISTINE M. GRAVELLE, U.S.B.J.**

INDEX

I.      Introduction.................................................................................................................3
II.     Jurisdiction.................................................................................................................5
III.    Findings of Facts ........................................................................................................5
        A.  The Parties ........................................................................................................5
        B.  The Criminal Complaint and Judgment ............................................................6
        C.  The First Appeal of the Judgment ..................................................................11
        D.  The First Criminal Appellate Judgment..........................................................14
        E.  The Second Appeal of the Judgment ...............................................................16
        F.  The Second Criminal Appellate Judgment ......................................................17
        G.  Additional Appellate Practice .........................................................................20
            (i)     The Annulment Action ..........................................................................20
            (ii)    The First Collateral Appeal ..................................................................21
            (iii)   The Second Collateral Appeal ..............................................................21
            (iv)    The Third Collateral Appeal .................................................................22
            (v)     Petition to the European Court of Human Rights .................................23
        H.  The Civil Proceeding .......................................................................................23
        I.  Appeal of Civil Judgment ................................................................................25
IV.     Legal Analysis and Conclusions of Law ..................................................................26
        A.  Summary Judgment is Inappropriate at this Stage ..........................................26
        B.  The Romanian Judgment is Entitled to Recognition ......................................27
            (i)     The Doctrine of Comity ........................................................................31
            (ii)    Application of the Doctrine of Comity ..................................................32
                    (a) The Judgment was Entered by a Competent Court ......................32
                    (b) The Judgment was Brought Upon Due Allegations .....................34
                    (c) The Judgment was Entered in a Clear and Formal .....................37
                    (d) There is No Special Ground to Impeach the Judgment ..............37
            (iii)   The Recognition Act .............................................................................45
            (iv)    Application of the Recognition Act .......................................................47
                    (a) The Judgment Grants a Recovery of Money ..............................47
                    (b) The Judgment is Final, Conclusive ...........................................49
                    (c) The Judgment Does Not Invoke Any of the Exceptions Set Forth in the
                        Recognition Act ........................................................................49
                    (d) The Liquidator Met Her Burden of Proving Recognition of the
                        Judgment ...................................................................................51
        C.  Sakarya's Claim Objection ..............................................................................52
        D.  Collateral Estoppel Cannot be Used to Determine ........................................53
V.      Conclusion ...............................................................................................................64

## I.      INTRODUCTION

The matters before the Court stem from debtor, Kamuran Cortuk's ("the Debtor"), pre-petition involvement in Banca Turco Romana, SA ("BTR"), a Romanian bank of which Debtor was a director.  BTR holds a judgment of approximately $134,000,000.00 (the "Judgment") against Debtor entered by a Romanian court based upon findings of loan fraud and diversion of BTR funds by Debtor.  BTR claims that, as a result of the loan fraud and diversion of funds by Debtor and others, it was placed into compulsory liquidation in 2002 pursuant to Romanian law.  The Fondul de Garantare a Depozitelor Bancare was appointed as the judicial liquidator of BTR, with Maria Cornelia Saita ("Liquidator") authorized as representative.

The Liquidator filed a successful petition for recognition of a foreign proceeding in the United States Bankruptcy Court for the Southern District of Florida.  Debtor subsequently filed his own personal bankruptcy in this Court on November 29, 2017.  The Liquidator filed the present adversary proceeding against Debtor on December 21, 2019.  The complaint contains six counts. The first three counts seek a determination that Debtor's debt owed pursuant to the Judgment is non-dischargeable pursuant to 11 U.S.C. §§ 523 (a)(2)(A), (a)(4) and (a)(6).  The fourth through sixth counts seek a determination that Debtor is not entitled to a discharge pursuant to 11 U.S.C. §§ 727 (a)(3), (a)(4)(A), and (a)(5).

Debtor filed a motion seeking partial summary judgment asking this Court to refuse recognition of the Judgment thereby preventing its use as evidence (the "Debtor's Motion") (ECF Doc. Nos. 30 and 31).[1]  Noting the Liquidator's intent to file her own motion for partial summary judgment, the Court entered a briefing schedule for the filing of the Liquidator's objection to Debtor's motion and for the filing of her own motion for partial summary judgment.

---

[1] Unless otherwise specified, citations to ECF documents refer to filings in Adv. Pro. No. 18-1651.

A number of filings followed, including the Liquidator's cross-motion for partial summary judgment as to the first three counts of her adversary complaint (the "Liquidator's Motion") (ECF Doc. No. 43), her responses to Debtor's Motion (ECF Doc. No. 42) and Debtor's reply (ECF Doc. No. 49), Debtor's objection the Liquidator's Motion (ECF Doc. No. 50) and the Liquidator's reply (ECF Doc. No. 52), two supplemental certifications of Debtor in opposition to the Liquidator's Motion (ECF Doc. Nos. 53 and 56), and the Liquidator's supplemental certification in support of the Liquidator's Motion (ECF Doc. No. 57).

At substantially the same time as Debtor's Motion was filed in the adversary proceeding, Yesim Sakarya ("Sakarya"), Debtor's daughter and a creditor of Debtor's bankruptcy estate,[2] filed an objection to the proof of claim filed by the Liquidator in Debtor's main case (the "Claim Objection") (ECF Doc. No. 229 in Case No. 17-34019).  Similar to the Debtor's Motion, the Claim Objection is based upon the belief that the Judgment forming the basis of BTR's claim is invalid. The Liquidator filed opposition to the Claim Objection (ECF Doc. No. 249 in Case No. 17-34019), to which Sakarya filed a reply (ECF Doc. No. 268 in Case No. 17-34019).

Due to the identity of issues, the Debtor's Motion, Liquidator's Cross-Motion, and Claim Objection have proceeded in tandem.  The Court entered an order scheduling times for the production of discovery responses relevant to the motions pending in the adversary proceeding as

---

[2] This Court disallowed Sakarya's proof of claim by Order dated July 16, 2021, entered in associated adversary proceedings brought by the Chapter 7 Trustee for Debtor's bankruptcy estate against Sakarya (the "Order") (ECF Doc. Nos. 82 and 90 in Adv. Pro. No. 17-0176 and ECF Doc. Nos. 82 and 90 in Adv. Pro. No. 19-2073).  The Order granted the Trustee's motion for partial summary judgment, finding Sakarya liable for preferential transfers and ordering her to turnover property of the estate.  Pursuant to 11 U.S.C. § 502(d), Sakarya's claim will remain disallowed until such time as she satisfies the Order.  Sakarya has filed an appeal of the Order.  The disallowance of Sakarya's claim brings her standing to press her objection to BTR's claim into question.  The issue of standing has not been raised by the parties, presumably because the Claim Objection has been pending for some time prior to the disallowance of Sakarya's claim.  Because of this, and because the Claim Objection raises substantially similar issues to those raised in the Debtor's Motion, it will be addressed here regardless of any issues relating to Sakarya's standing.

well as to the claim objection and for the submission of proposed findings of fact and conclusions of law as to the pending motions (ECF Doc. No. 58; ECF Doc. No. 294 in Case No. 17-34019).

Having reviewed the proposed findings of fact and conclusions of law submitted by the parties (ECF Doc Nos 67 and 75), along with the references to the record contained therein, the Court finds the following facts to be the relevant facts and adopts them as its own.

Applying its conclusions of law, which are discussed in Part II of this decision, the Court finds that while the Judgment is entitled to recognition, it does not preclude Debtor from litigating the merits of the non-dischargeability action. Based upon these finding, the Court OVERRULES the Claim Objection, DENIES Debtor's Motion and DENIES the Liquidator's Motion.

## II.    JURISDICTION

The Court has jurisdiction over these contested matters under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended October 17, 2013, referring all bankruptcy cases to the bankruptcy court. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (B), (I), (J) and (O). Venue is proper in this Court pursuant to 28 U.S.C. § 1408. Pursuant to Fed. R. Bankr. P. 7052, the Court issues the following findings of fact and conclusions of law.

## III.    FINDINGS OF FACT

### A.  The Parties

1. The Debtor is a citizen of Turkey and currently resides there. ECF Doc. No. 50-1, Certification of Kamuran Cortuk dated July 11, 2019 ("Debtor Cert.") at ¶ 1, and subsequent statements of the Debtor on the record.

2. From approximately 2015 to sometime in 2020, Debtor resided in the U.S. and held a Green Card. Debtor Cert. at ¶ 2.

3.  During the 1990s, the Debtor was a businessman and led a conglomerate of Turkish companies, known as the "Bayindir Group," that operated in many industries in various countries, including in the banking and construction sectors. Debtor Cert. at ¶¶ 2-4.

4.  The Bayindir Group included Bayindir Holding A.S. ("Bayindir Holding") and Bayindir Turizm Ticaret Ve Sanay A.S. ("Bayindir Turizm").  The Debtor was the president of Bayindir Holding.  ECF Doc. No. 43-3, at 5.

5.  Formed on December 22, 1993, BTR offered banking services to companies and individuals, including deposit accounts, loan services, and other banking operations associated with the import and export industry.  ECF Doc. No. 43-3, at 5-6.

6.  In 1996, Bayındir began investing in real estate projects in Romania. Debtor Cert. at ¶¶ 5-8.

7.  Soon thereafter, Bayındir invested in BTR.   Debtor Cert. at ¶¶ 9-18.

8.  During the period of February 1998 to October 2000 (the "Relevant Period"), three Bayindir companies and the Debtor held interests in BTR: Bayindir Holding held a 63.5%.  Bayindir Turizm, Bayindir Securities Inc., and the Debtor held minority interests.  ECF Doc. No. 43-3 at 5; ECF Doc. No. 52-31, at 2-3.

9.  During the Relevant Period, the Debtor was a non-voting (Debtor Cert. at ¶ 26) member of BTR's board of directors and the president of Bayindir Holding.  ECF Doc. No. 43-3, at 5.

10. In late 2000 and early 2001, BTR suffered a liquidity crisis resulting from the foreclosure of several collateral deposits placed at foreign correspondence banks.  ECF Doc. No. 43-3, at 4.

### B.  The Criminal Complaint and Judgment

11. Subsequently, the National Bank of Romania (the "NBR"), Romania's banking authority, took over the administration of BTR and, on February 12, 2001, filed a criminal complaint against the Debtor and a number of BTR's officers and board members for the damage caused by the loan scheme described below.  ECF Doc. No. 43-3, at 4; ECF Doc. No. 52-1, at ¶ 7.

12. The NBR alleged that BTR's officers executed agreements with foreign banks to secure loans for the benefit of Bayindir Holding and Bayindir Turizm (together, the "Bayindir Entities"), and that the Debtor, the president of Bayindir Holding (BTR's majority

shareholder), was aware of these transactions and approved a false balance sheet as a board member.  ECF Doc. No. 52-1, at ¶ 8.

13. Shortly thereafter, the Romanian General Inspectorate of Police (the "Romanian Police") commenced a criminal investigation to investigate the complaint under file no. 00069/2001 (the "Criminal Investigation File").  ECF Doc. No. 52-1, at ¶ 9.  This initiated the investigative stage of the criminal proceedings and triggered investigations against the Debtor and other board members of BTR.  ECF Doc. No. 52-1, at ¶ 9.

14. On April 12, 2001, BTR filed an application to participate in the criminal investigation file as a civil party, alleging damages as of April 14, 2001 in excess of USD $48 million and EUR €9 million.  ECF Doc. No. 52-1, at ¶ 11.

15. The Romanian Police made several attempts to subpoena the Debtor to appear. On April 12, 2001, the Romanian Police delivered a subpoena to the Debtor at the address of his company, Bayindir Holding for a hearing on May 14, 2001.  ECF Doc. No. 52-1, at ¶ 12.

16. Three separate rogatory commissions were also issued to serve subpoenas on the Debtor through the Prosecutor's Office of the High Court of Cassation and Justice (the "Romanian Prosecutor Office") to the Romanian Supreme Court, which provided the rogatory commission to the Turkish General Prosecutor's Officer for service on the Debtor in Turkey. ECF Doc. No. 52-1, at ¶ 13.  The rogatory commissions issued for various hearing dates set between August 2001 and January 2002, but the Debtor did not attend any of the hearings. ECF Doc. No. 52-1, at ¶¶ 13-16, 19-20.

17. On September 10, 2002, the Turkish Embassy in Romania confirmed that the Debtor was served at "the registry office where he works," Bayindir Holding. ECF Doc. No. 52-1, at ¶ 21; ECF Doc. No. 52-6.

18. As the Debtor's domicile was unknown, the Romanian Prosecutor's Office issued an order of preventive arrest against the Debtor. ECF Doc. No. 52-1, at ¶ 22.  The Romanian Prosecutor's Office also commenced an international search of the Debtor and other Turkish defendants through the International Criminal Police Organization (INTERPOL). ECF Doc. No. 52-1, at ¶ 22.

19. To continue its criminal investigation, the Romanian Prosecutor's Office issued an ordinance ordering the preparation of a financial accounting expert's report, which was completed on February 28, 2003.  ECF Doc. No. 52-1, at ¶ 23.

20. On January 17, 2003, the Debtor executed a power of attorney in favor of lawyers Cristian Iordanescu ("Iordanescu") and Gheorghe Dragomir ("Dragomir") to represent him before "the Prosecutor's Officer … to examine file no. 111/P/2001 in order to establish the legal

situation before him and provide him with a report in this regard."  ECF Doc. No. 52-1, at
¶24.

21. On May 26, 2003, Iordanescu requested access to the criminal file to investigate the file as
the Debtor's counsel.  ECF Doc. No. 52-1, at ¶ 27.

22. Dragomir also accessed the criminal file on August 4, 2003, to obtain access to the arrest
warrant against the Debtor, the ordinances initiating the prosecution and arrest of the Debtor,
and the financial accounting expert report.  ECF Doc. No. 52-1, at ¶ 28; ECF Doc. No. 52-
10.

23. On October 1, 2003, the High Court of Cassation and Justice in Romania indicted the Debtor
on charges of various crimes related to bank fraud involving BTR, which resulted in
criminal proceedings against the Debtor (the "Criminal Proceedings").  *See* ECF Doc. No.
30-3.

24. The Debtor was summoned to the initial hearing in the Criminal Trial Case set for November
5, 2003, by display at the door of the Criminal Trial Court.  ECF Doc. No. 52-1, at ¶ 31.  At
the November 5, 2003 hearing, Dragomir appeared on behalf of the Debtor and requested
the issuance of summons to the Debtor at two addresses, the Debtor's domicile and the
Debtor's residence.  ECF Doc. No. 52-1, at ¶ 32 (citing ECF Doc. No. 43-7 & ECF Doc.
No. 45-1, at 5-6).  The hearing minutes reflect that the domicile address Dragomir provided
was "Samsun, Tekkekoy, Cirakman Commune, Sabit Sagiroglu no. 5," and the residence
address provided was "Istanbul, Besiktas, Gayrettepe 06213, Prf Dr Bulent Tarcan Bayindir
Holding no. 1D:8."  ECF Doc. No. 45-1, at 6 (see also ECF Doc. No. 43-7).  At the hearing,
Dragomir argued for the revocation of the preventive arrest warrant for the Debtor.  ECF
Doc. No. 52-1, at ¶ 33 (citing ECF Doc. No. 43-7 & ECF Doc. No. 45-1, at 2-3).

25. The hearing was continued to January 21, 2004, and Dragomir successfully argued for the
revocation of the preventive arrest warrant.  ECF Doc. No. 52-1, at ¶ 34; ECF Doc. No. 52-
11, at 3 & 5.  The minutes of the hearing reflect that Dragomir indicated that, "[c]onsidering
that the domiciles of the defendants are known … not even the presence of the defendants
before the court is required, as these are represented by the lawyers who are defending their
interests and the case may also be judged in the absence of the defendants."  ECF Doc. No.
52-11, at 3.

26. On February 10, 2004, the Debtor provided a notarized statement to the Bucharest Court (in
a satellite file) requesting that service of any future summons and acts of procedure issued
to him in connection with the Criminal Trial Case should be effected at the office of
Dragomir, at "Christian Iordanescu si Asociatii" located at "Romania, Bucharest, str.
Capitan Vijelie nr. 20, sector 5."  ECF Doc. No. 52-18, at 2-3.

27. Dragomir or another lawyer from his law firm appeared on behalf of the Debtor and made arguments on his behalf in subsequent hearings held on May 12, 2004, November 24, 2004, February 2, 2005, and April 6, 2005. ECF Doc. No. 52-1, at ¶ 37-38, Ex. 11.

28. Despite being summoned in the manner requested for the subsequent hearing on January 18, 2006, and subsequent hearings, Dragomir ceased attending scheduled hearings on behalf of the Debtor. ECF Doc. No. 52-1, at ¶ 40.

29. At no point during the Criminal Trial Case, did the Debtor nor Dragomir file any document substituting a new counsel or otherwise terminating Dragomir's relationship as the Debtor's counsel. ECF Doc. No. 52-1, at ¶ 40. The Criminal Trial Court noted that Dragomir, as the "chosen defender" of the Debtor, was obligated under Romanian law "to ensure their substitution in the event of being unable to attend." ECF Doc. No. 52-1, at ¶ 41 & ECF Doc. No. 52-13, at 2. The Criminal Trial Court also ordered the representation by a lawyer ad-litem and postponed the case until March 1, 2006. ECF Doc. No. 52-1, at ¶ 41; ECF Doc. No. 52-13, at 2.

30. Pursuant to the Criminal Trial Court's order, the Bucharest Bar appointed Loredana Iordache as the Debtor's *ad litem* lawyer on February 27, 2006. ECF Doc. No. 52-1, at ¶ 44. At the March 1, 2006 hearing, the Criminal Trial Court granted Ms. Iordache's request to postpone the hearing to permit her time to study the file and postponed the hearing until March 15, 2006. ECF Doc. No. 52-1, at ¶ 45.

31. At the following hearing, the Criminal Trial Court commenced its review of the entire file by reading the indictment and hearing the statement of one of the defendants. ECF Doc. No. 52-1, at ¶ 46 (citing ECF Doc. No. 52-15). The Criminal Trial Court continued the hearing to March 29, 2006 to summon witnesses. ECF Doc. No. 52-1, at ¶ 46; ECF Doc. No. 52-15, at 3. As certain witnesses failed to appear, the Criminal Trial Court continued the hearings to April 19, 2006, then to May 17, 2006, and finally, to June 14, 2006, to permit the witnesses to appear and provide evidence. ECF Doc. No. 52-1, at ¶ 46. Ms. Iordache, the Debtor's *ad litem* lawyer, appeared on behalf of the Debtor at each of these hearings.

32. Dragomir did not make any further appearances on the Debtor's behalf after April 2005. ECF Doc. No. 52-1, at ¶ 47. But, on November 2, 2006, Stefania Dragomir submitted a request with the seal of Dragomir's law firm to obtain access to the documents in the criminal file on the Debtor's behalf. ECF Doc. No. 52-1, at ¶ 47.

33. The Criminal Trial Court attempted to serve the Debtor for appearance in two further hearings. ECF Doc. No. 52-1, at ¶ 48. Service was attempted on the Debtor for a hearing set for January 31, 2007 by rogatory commission to the domicile and residence addresses provided by Dragomir, and also by publication at the Criminal Trial Court's door and the Local Council's door, but the Debtor did not appear and the Criminal Trial Court continued the final hearing to April 11, 2007. ECF Doc. No. 52-1, at ¶¶ 48-49.

34. The Criminal Trial Court ordered service to the Debtor's domicile address provided by Dragomir and by registered mail and publication at the Criminal Trial Court's door and the Local Council's door.  ECF Doc. No. 52-1, at ¶¶ 48-49.  The Debtor was served at his domicile on February 15, 2007. ECF Doc. No. 52-1, at ¶ 49 & ECF Doc. No. 52-16.

35. On April 11, 2007, the Criminal Trial Court heard the merits of the case in Debtor's absence. ECF Doc. No. 52-1, at ¶ 50; ECF Doc. No. 52-18, at 2-4.  The Debtor's *ad litem* lawyer took part in the hearing and made the following arguments on behalf of the Debtor: (i) that the statements from the witnesses at trial showed that the deposits made by BTR in the foreign banks were not collateral deposits; (ii) that a majority of the foreign payments made to ensure the loans to the Bayindir entities were recovered; (iii) that the damage to BTR was not caused by the loan scheme but by an economic crisis abroad; and (iv) that the Debtor had no known criminal record.  ECF Doc. No. 52-1, at ¶ 50; ECF Doc. No. 52-17, at 4.

36. On April 11, 2007, the District Court of Bucharest found the Debtor guilty of various bank fraud crimes, sentenced him to 13 years in prison, and, applying the Romanian Criminal Code, ordered the Debtor (along with several other defendants) to pay $59,421,921.04 USD and €11,326,199.99 EUR, with legal interest calculated as of March 31, 2003, to BTR (the "Judgment").  *See* ECF Doc. No. 30-3, ECF Doc. No. 43-3.

37. In issuing the Judgment, the Criminal Trial Court considered significant evidence, including: declarations of witnesses, including BTR's employees and officers; documentary evidence, such as letters and documents submitted by BTR; documents submitted by the NBR; declarations of the defendants; communications from banking institutions; and accounting experts reports.  ECF Doc. No. 43-3, at 3-4.

38. The Judgment held that during the period of February 3, 1998 to October 27, 2000, the Debtor, a member of BTR's board of directors and president of Bayindir Holding, used his position of influence to cause several officers of BTR to create and extend collateral deposits totaling approximately USD $122,800,000.00 (the "Collateral Deposits") in four correspondent banks of BTR to guarantee loans made by these partner banks to companies under the control of the Debtor: Bayindir Holding and Bayindir Turizm.  ECF Doc. No. 43-3, at 5 & 25-26.

39. The Bayindir Entities did not make any request to BTR to provide the Collateral Deposits. ECF Doc. No. 43-3, at 7.  Further, BTR did not request or charge a commission for the Collateral Deposits and the Bayindir Entities did not pay any commission or other form of consideration to BTR in exchange for committing its liquid assets as Collateral Deposits. ECF Doc. No. 43-3, at 4, 7 & 23.

40. The Collateral Deposits were initially recorded as time deposits in BTR's books, and then turned into collateral deposits without the formal approval of or due deliberation by BTR's

board of directors.  ECF Doc. No. 43-3, at 5, 25-26.  Further, the nature of the deposits was never updated in BTR's books and records to avoid alerting the NBR of its lack of liquidity. ECF Doc. No. 43-3, at 5, 25-26.  The Criminal Trial Court further held that BTR calculated and presented to the NBR false financial statements and records to conceal that its liquidity levels were well below the minimum reserve levels, which constituted a violation of Romanian Banking Laws.  ECF Doc. No. 43-3, at 26.

41. The Bayindir Entities did not pay the secured loans when due, causing the correspondent banks to seize BTR's Collateral Deposits, leading to the financial collapse of BTR and, ultimately, its bankruptcy.  ECF Doc. No. 43-3, at 26.

42. The Criminal Trial Court held that the above actions by BTR's officers to elude detection by the NBR of their violation of Romanian banking law were "known and monitored by Kamuran Cortuk."  ECF Doc. No. 43-3, at 26.

43. In determining the Debtor's culpability, the Criminal Trial Court considered the immediate consequences of his actions and the "major implications not only for [BTR] but also its injured customers," and sentenced the Debtor to a harsher sentence than the other defendants given "his decisive contribution in causing the other defendants to commit the crimes of abuse of office."  ECF Doc. No. 43-3, at 26.

44. In determining the liability owed to BTR, the Criminal Trial Court considered that BTR was able to recover a portion of the Collateral Deposits made for the benefit of the Bayindir Entities after these were due.  ECF Doc. No. 43-3, at 26.

45. Specifically, after the Collateral Deposits were foreclosed upon by the correspondent banks, during November 2000 and April 2001, with the NBR's and its counterpart Turkish authorities' involvement, about USD $62 million was recovered due to repayment to the correspondent banks by the Bayindir Entities or by direct repayment from individuals and entities associated with the Bayindir Group.  ECF Doc. No. 43-3, at 26.

46. Notwithstanding the partial recovery, the Criminal Trial Court found that "[t]he prejudice caused to BTR" resulting from the scheme perpetrated by the Debtor and the other defendants totaled USD $59,421,921.04 and EUR €11,326,199.99 plus interest.  ECF Doc. No. 43-3, at 28.

### C.  The First Appeal of the Judgment

47. On February 13, 2008, the Debtor filed a notice of appeal (the "First Criminal Appeal") of the Judgment to the Bucharest Court (the "First Criminal Appellate Court").  ECF Doc. No. 52-1, at ¶ 54 (citing ECF Doc. No. 52-18), re-submitted in open session at the hearing of March 17, 2008 and with the reasons of appeal submitted on September 29, 2008.

48. The day after filing his notice of appeal, the Debtor executed power of attorney no. 96618 to Dragomir to provide "assistance, consultancy and representation" before the First Criminal Appeal Court in connection to file no. 86/299/2003.  ECF Doc. No. 52-20, at 2.

49. In his appeal, the Debtor sought the dissolution of the Judgment and a retrial on the basis that the trial was conducted in his absence, that he never received any written communication from any authority in Romania and that he was not permitted to present evidence for his defense.  ECF Doc. No. 52-1, at ¶ 55 (citing ECF Doc. No. 52-18).

50. He argued that he was not properly summoned for trial as the summons was directed to the wrong address.  The First Criminal Appellate Court considered the Debtor's argument and dismissed it as "unfounded."  ECF Doc. No. 31-7, at p. 40-41, 60-61; ECF Doc. No. 43-2 at ¶ 19.

51. Dragomir represented the Debtor in the First Criminal Appeal and attended the hearings and presented arguments on behalf of the Debtor.  ECF Doc. No. 52-21, at 2; ECF Doc. No. 56-1, at 7.

52. During the First Criminal Appeal, the Debtor made several address changes and, ultimately, requested service to be provided to him at Dragomir's office.  ECF Doc. No. 52-1, at ¶ 59; ECF Doc. No. 59-21, at 2.

53. In his notice of appeal, the Debtor listed his domicile as "Samsun, Tekkekoy, Kutlukent Cirakman Mahalle, Turkey," and his "chosen domicile" as Dragomir's address in Bucharest, Romania.  ECF Doc. No. 52-1, at ¶ 54; ECF Doc. No. 52-17, at 2.  Then, on April 7, 2008, Dragomir provided yet another request by the Debtor for transmission of documents to another domicile in Istanbul, Turkey.  ECF Doc. No. 52-1, at ¶ 57 (citing ECF Doc. No. 52-20, at 3).  This address was subsequently corrected by Dragomir at a hearing held on May 12, 2008.  ECF Doc. No. 52-1, at ¶ 58; ECF Doc. No. 52-20, at 4-5.

54. A year into the First Criminal Appeal, on March 16, 2009, Dragomir requested a new hearing to translate from Turkish to Romanian several documents provided by the Debtor that Dragomir claimed were a key part of his client's defense.  ECF Doc. No. 52-1, at ¶ 60; ECF Doc. No. 52-21, at 2.  Dragomir argued that these documents demonstrated the Debtor's lack of authority and decision making over the Bayindir Group, including the Bayindir Entities, and that the Debtor did not hold a decision-making position with BTR at the time of the alleged wrongdoing.  ECF Doc. No. 52-1, at ¶ 60; ECF Doc. No. 52-21, at 3.  The First Criminal Appellate Court granted a new hearing to permit Dragomir to submit the translated documents of the evidence he claimed supported the Debtor's defense.  ECF Doc. No. 52-21, at 3-4.

55. Dragomir attended subsequent hearings held on June 12, 2009, September 16, 2009, December 9, 2009, February 3, 2010, March 3, 2010, March 31, 2010, September 15, 2010,

October 20, 2010, November 17, 2010, and December 15, 2010.  ECF Doc. No. 52-1, at ¶ 61.  During these hearings, Dragomir argued for the continuance of the hearings given the lack of personal notice to other appellants.  ECF Doc. No. 52-1, at ¶ 61.

56. At a hearing on February 9, 2011, the First Criminal Appellate Court recognized that Romanian law permitted notice of a hearing to an individual through his counsel, deeming the presence of Dragomir and of the other appellants' counsel to constitute sufficient notice of the hearing.  ECF Doc. No. 52-1, at ¶ 62; ECF Doc. No. 52-23, at 2.

57. Despite adjourning for a new hearing, due to the failure to attend by various co-appellants and Dragomir's requests, the Court did not hear the merits of the Debtor's appeal, and Dragomir's request, until April 6, 2011.  ECF Doc. No. 52-1, at ¶ 63; ECF Doc. No. 52-23.

58. At the April 6, 2011 hearing, three years after the Debtor filed his appeal, the First Criminal Appellate Court considered Dragomir's request to introduce translated documents and other evidence and other grounds of appeal.  ECF Doc. No. 52-23.

59. At the hearing, Dragomir made several requests.  ECF Doc. No. 52-23.  He requested that the Romanian Prosecutor's Office translate from Turkish to Romanian several documents used in the preparation of the expert report presented in the Criminal Trial Case.  ECF Doc. No. 52-23, at 4.  The Court rejected this request as the documents were technical in nature and were considered in the preparation of the expert report and when other technical evidence during the Criminal Trial Case was established.  ECF Doc. No. 52-23, at 4.

60. The Court also considered Dragomir's request to introduce a new audit report by another expert, a graphic expert report, and a handwriting expert report.  ECF Doc. No. 52-23, at 6.  The Court rejected Dragomir's requests for the audit report and the new expert evidence because the Debtor willingly failed to appear during the trial phase and could not invoke his own absence to obtain a retrial.  ECF Doc. No. 52-23, at 7 (noting that "nobody can invoke his fault to redo procedural documents").  The Court also denied Dragomir's request to introduce new witness testimony by representatives of Bayindir Turizm and BTR regarding the Debtor's lack of capacity as a decision maker.  ECF Doc. No. 52-23, at 6.

61. Dragomir also sought to introduce documents from Bayindir Turizm and foreign banks showing that the Debtor did not have the capacity of president of the board of directors or major shareholder.  ECF Doc. No. 52-23, at 6.  The court reasoned, however, that other than stating general categories of documents, Dragomir did not specifically point to any document that contradicted the evidence already in the record or otherwise considered in the expert report.  ECF Doc. No. 52-23, at 7.  Accordingly, the First Criminal Appellate Court also rejected this request. ECF Doc. No. 52-23, at 7.  The court stressed that "[t]he witnesses were heard and their testimonies are attached and registered in the file before an impartial and independent court, therefore, the requested evidence shall be rejected."  ECF Doc. No. 52-23, at 7.

62. Dragomir also sought to introduce the testimony of the Debtor by way of letter rogatory. ECF Doc. No. 52-23, at 7. This request was also denied by the court as Romanian law forbids an accused to testify by letter rogatory. ECF Doc. No. 52-23, at 7. The First Criminal Appellate Court reasoned that this request would only cause further delay, and that permitting a new hearing of the Debtor four years after the commencement of the appellate term would be tantamount to a potential abuse of the right to defense. ECF Doc. No. 52-23, at 7.

63. At the end of the hearing, the First Criminal Appellate Court also permitted the parties to submit written conclusions prior to entering a decision. ECF Doc. No. 52-23, at 18.

   D.  The First Criminal Appellate Judgment

64. On April 20, 2011, the First Criminal Appellate Court entered its decision on the Debtor's First Criminal Appeal, Criminal Decision no. 143/A (the "First Criminal Appellate Judgment"). ECF Doc. No. 52-1, at ¶ 69; ECF Doc. No. 52-24.

65. In the First Criminal Appellate Judgment, the First Criminal Appellate Court considered, and rejected, the other grounds of appeal by the Debtor. The First Criminal Appellate Court considered the Debtor's argument that he had not been properly served during the Criminal Trial Case, noting that despite ordering the preventive arrest of the Debtor (as well as of other defendants), the Debtor and the other defendants fled Romania. ECF Doc No. 52-24, at 47. Further, the court noted that three summonses were issued to serve the Debtor by way of letter rogatory but that these steps did not result in the Debtor's appearance. ECF Doc. No. 52-24, at 47.

66. The First Criminal Appellate Court reviewed the evidence de novo and overturned the Debtor's conviction for indirect participation in forgery as the prescription period had run. ECF Doc. No. 52-24, at 48. However, the First Criminal Appellate Court affirmed the conviction for instigation of abuse of public office, holding that the Criminal Trial Court "acknowledged legally and thoroughly the issue in fact, establishing the contribution of each defendant to the criminal activity upon a thorough review of all the evidence submitted." ECF Doc. No. 52-24, at 47, 50 (holding that the "other provisions of the appealed criminal sentence shall be kept").

67. In so doing, the First Criminal Appellate Court acknowledged the following:

Thus, the documents in the docket of criminal investigation show that … BTR was engaged over the exposure limit stipulated by the regulations of the [NBR], by signing guarantee/financing agreements for loans granted by foreign corresponding banks with Turkish capital in the Netherlands, Vienna, Geneva, Malta, Bahrein and Norther [sic] Cyprus, to Bayindir Holding, the major shareholder of the bank … By not submitting the concerned agreements with [BTR] and by issuing documents related to the

14

investment/extension of the concerned documents as term deposits and not as collateral deposits or credit, it was intended to hide the real economic content of the concerned operations, thus establishing false financial statements (balance sheet, reports to [NBR]). For the loan or financing commitments granted to Bayindir Holding, no guarantees were established, and no commissions were charged ….

The documents taken into possession by the [NBR] showed that the signatures by which the Turkish-Romanian Bank S.A. was engaged to the above-mentioned transactions were provided by [BTR's administrators]; Kamuran Cortuk, president of Bayindir Holding A.S. was aware of this situation; in this capacity, he knew that Bayindir Holding benefitted from the concerned amounts, and in his capacity as member of the Board of Directors of [BTR] approved a false balance sheet."

ECF Doc. No. 52-24, at 37.

68.   The First Criminal Appellate Court also reiterated the findings of the Criminal Trial Court regarding the Debtor's conduct as follows:

a. That the "opening collateral deposit accounts at some foreign banks "without any written request by the Bayindir Holding, accompanied by the related documentation stipulated by the banking regulations, shows that the defendants Kamuran Cortuk [and other defendants] . . . accepted the opportunity to destabilize a Romanian financial institution, in order to support [the Bayindir Entities]."  ECF Doc. No. 52-24, at 40.

b. That when the new management of BTR became aware of the Collateral Deposits and of the risk to which BTR was exposed, the new management approached "the management of Bayindir Holding, and the president of this company - Kamuran Cortuk personally, and requested the urgent reimbursement of the loans and release of the guarantees provided by BTR in the letter dated June 15, 2000."  However, the First Criminal Appellate Court found that such request "did not lead to the reimbursement of the loans and payments of the accumulated interest" owed to BTR.  ECF Doc. No. 52-24, at 40.

c. That the evidence obtained by the expert showed that "the method used by Levent Yurukogly, in his capacity as president, and Murat Koncavar - vice-president, the signatory parties for the collateral deposits used to guarantee loans granted to Bayindir Insaat Turizm [ ], was known and monitored by Kamuran Cortuk, being designed to elude the provisions of the Banking Law no. 58/1998."  ECF Doc. No. 52-24, at 41.

d. That "With regards to the defendants Yurokoglu Levent Hussein and Koncavar Murat, the signatory parties of the commitment agreements with DemirBank and endorsement agreements with Banque Francaise de l'Orient, which led to the execution of collateral deposits, respectively not recovering the loans as well as with regards to Kamuran Cortuk, who contributed to the instigation of the two, it was also acknowledged correctly causing damage with extremely severe consequences, evaluated at USD 59,421,921.04 and EUR 11,326,199.99."  ECF Doc. No. 52-24, at 42.

E.  The Second Appeal of the Judgment

69. On May 4, 2011, the Debtor filed a notice of appeal (the "Second Criminal Appeal") of the First Criminal Appellate Judgment with the Bucharest Court of Appeal – II Criminal Chamber (the "Second Criminal Appellate Court"), and refiled the same notice of appeal on May 9, 2011, with the reasons of appeal filed on September 14, 2011.  ECF Doc. No. 52-1, at ¶ 74 (citing ECF Doc. No. 52-25, at 2-4).  The Debtor's basis for the appeal of the First Criminal Appellate Judgment was that it was "manifestly illegal and essentially groundless."  ECF Doc. No. 52-25, at 2 & 4.  In his notice of appeal, the Debtor stated that Dragomir no longer represented him.  ECF Doc. No. 52-1, at ¶ 74 (citing ECF Doc. No. 52-25, at 2 & 4).  The notice requested service at the Debtor's home address of "Yesil Cimen Sokak, Polat Tower no. 4/256, Besiktas, 34394, Istanbul Turkey."  ECF Doc. No. 52-1, at ¶ 74 (citing ECF Doc. No. 52-25, at 4).  About two weeks before the filing of the notice of appeal, the Debtor submitted a life insurance agreement that displayed his son's address to be virtually identical to the address at the notice but with the number "12/256." ECF Doc. No. 52-1, at ¶ 74 (citing ECF Doc. No. 52-26)).

70. As the Debtor stated he was not represented by counsel in his notice of appeal, the Second Criminal Appellate Court issued service to the Debtor by registered mail and rogatory commission for hearings on December 12, 2011, February 27, 2012, and March 19, 2012. ECF Doc. No. 52-1, at ¶ 75.  However, none of these attempts to reach the Debtor were successful.  ECF Doc. No. 52-1, at ¶ 75.

71. As the Debtor was not represented by counsel, an *ad litem* lawyer was appointed to represent the Debtor in the Second Criminal Appeal.  *See, e.g.*, ECF Doc. No. 52-27, at 2 (appearing and arguing on behalf of the Debtor) & ECF Doc. No. 52-28, at 2 (appearing and arguing on behalf of the Debtor at hearing on merits of Second Criminal Appeal).

72. During the March 19, 2012 hearing, the Second Criminal Appellate Court found that the Debtor could not be served at the address indicated because he simply did not live there and ordered the Debtor's summoning for the next hearing, set for April 23, 2012, by display on the doors of the court and the Local Council.  ECF Doc. No. 52-1, at ¶ 77 (citing ECF Doc. No. 52-27, at 5).

73. At the April 23, 2012 hearing, the Debtor's *ad litem* lawyer requested that the Debtor's appeal be referred to the European Union's Court of Justice to issue a preliminary ruling on the consistency between the provisions of the Romanian criminal code and the European Union laws.  ECF Doc. No. 52-28, at 4.  The Second Criminal Appellate Court denied the request as no European Union law applied to the case or was relevant to the deliberation of the Second Criminal Appeal.  ECF Doc. No. 52-28, at 4-5.

74. The Debtor, through his *ad litem* lawyer, also requested that the Second Criminal Appellate Court consider both the evidence that was already part of the file and evidence that was

tendered by the Debtor during the appeal.  ECF Doc. No. 52-1, at ¶ 78 (citing ECF Doc. No. 52-28, at 6).  BTR did not oppose the admission of all the evidence requested by the Debtor, including new evidence.  ECF Doc. No. 52-1, at ¶ 79 (citing ECF Doc. No. 52-28, at 6).  The first request was granted as the Second Criminal Appellate Court deemed the evidence in the file as "useful and conclusive to the settlement of the case, and the probative relevance of these documents is going to be evaluated during deliberation."  ECF Doc. No. 52-1, at ¶ 78 (citing ECF Doc. No. 52-28, at 6).

75. Though BTR did not oppose the introduction of the new evidence tendered by the Debtor, the Second Criminal Appellate Court rejected the request to admit the new evidence tendered by the Debtor on March 12, 2012, as it was contrary to Romanian law.  ECF Doc. No. 52-1, at ¶ 79 (citing ECF Doc. No. 52-28, at 6).  Specifically, the Second Criminal Appellate Court held that the second level of appeal entails "solely competent matters of law" that must be "only based on the material in the file" and other evidence not previously tendered, whether hearing or documents, is only admissible if the defendants are present. ECF Doc. No. 52-1, at ¶ 79 (citing ECF Doc. No. 52-28 at 6).  As the Debtor was not present, the Second Criminal Appellate Court rejected his request to introduce new evidence.  ECF Doc. No. 52-28 at 7.

76. At the end of the hearing, the Second Criminal Appellate Court adjourned ruling to May 8, 2012, then to May 22, 2012, and finally to May 25, 2012, to permit the Debtor and the other appellants the opportunity to "submit written conclusions" and to deliberate its ruling.  ECF Doc. No. 31-7, at 2; ECF Doc. No. 52-28, at 16.

### F.   The Second Criminal Appellate Judgment

77. On May 25, 2012, the Second Criminal Appellate Court entered the Criminal Decision No. 1083/R under file no. 86/299/2003 (the "Second Criminal Appellate Judgment").  ECF Doc. No. 31-7.

78. The Second Criminal Appellate Judgment ruled on the Debtor's points of appeal.  ECF Doc. No. 31-7.  The Debtor argued that he was not summoned during the prosecution phase and during the adjudication of the case on the merits he was summoned at a wrong address, and (ii) the First Criminal Appellate Court's denial of his request to introduce new evidence supporting his defense or vacating the Judgment because certain documents were not translated to Romanian.  ECF Doc. No. 43-2, at ¶ 18, ECF Doc. No. 31-7, at 38-39 & 42-43.

79. The Second Appellate Court found the Debtor's first point on appeal to be "unfounded" and "groundless."  ECF Doc. No. 31-7, at 41 & 42.

80. The Second Criminal Appellate Court rejected the Debtor's contention that the judicial bodies of Romania and Turkey did not properly serve him with the summons during the prosecution phase. ECF Doc. No. 31-7, at 42. The Second Criminal Appellate Court dismissed this argument as an empty allegation without any detail or reasoning and highlighted that multiple rogatory commissions were ordered during the investigative phase to serve the Debtor and that the summons were delivered to the addresses provided by the Debtor's counsel. ECF Doc. No. 31-7, at 42.

81. With respect to the Debtor's assertion that he was not properly summoned during the prosecution phase of the Criminal Trial Case, the court noted that the underlying record "unambiguously" shows that "even the chosen counsel of the defendant Kamuran Cortuk, lawyer Gheorghe Dragomir, indicated both the defendant's domicile [address] and his residence [address], requesting summons to those addresses." ECF Doc. No. 31-7, at 41. The court added that the record reflected that the Debtor was summoned to the addresses provided by Dragomir. ECF Doc. No. 31-7, at 41.

82. The second address for summoning provided by Dragomir was delivered to Evrim Baykut, the lawyer of the Debtor's company, the Bayindir Group. ECF Doc. No. 31-7, at 41. Ms. Baykut provided a letter on behalf of the Debtor in this case advising that the Debtor is a party to three separate legal actions in Turkey totaling approximately USD $155 million, which "are not legally expected to end in the favor of [the Debtor]." ECF Doc. No. 43-2, at 7 n.2.

83. During the adjudication of the merits of the case, the court found that the Debtor was adequately summoned as the record reflected proof of service both at the Criminal Trial Court's door and the Local Council's door, effected at the direction of the Criminal Trial Court. ECF Doc. No. 31-7, at 42.

84. The court further noted that the address that the Debtor argued was the correct address, was not provided by Dragomir at any time as the address for service. ECF Doc. No. 31-7, at 42. The court added that the address invoked by the Debtor was only found in the Debtor's birth certificate, which reflected his birthplace, "and not at all as his stated residence." ECF Doc. No. 31-7, at 42.

85. The Second Appellate Criminal Court also indicated that despite being regularly summoned, the Debtor "chose not to appear before the court," instead having his chosen defense counsel, Dragomir, selectively appear in both the Criminal Trial Case and the First Criminal Appeal hearings, "watching however the evolution of the trial and claiming subsequently, in an unjustified manner, the failure to service the summoning procedure." ECF Doc. No. 31-7, at 56. The court added as an example of the Debtor's tactics, the Debtor's indication of a new service address in the second notice of appeal that was not his residence (with postal number "4/256"). ECF Doc. No. 31-7, at 56. The filing of the improper address prevented the summoning of the Debtor for the initial hearings during the Second Criminal

Appeal, which the court determined was done with the sole purpose of postponing the judgment of the appeal.  ECF Doc. No. 31-7, at 56.

86. The court also reiterated that the more severe sentence imposed on the Debtor as opposed to other BTR officers was the result of "the judicious assessment of the nature and concrete circumstances of the perpetration of the deeds" committed by the defendants, who "chose to repeatedly breach the legal obligations incumbent on them" as administrators of a Romanian bank with the goal of facilitating significant loans to the Debtor's companies. ECF Doc. No. 31-7, at 56.

87. The Second Criminal Appellate Court also dismissed the Debtor's second point on appeal - that the court rejected his request for graphical and accounting expert reports to be conducted and to permit his testimony via rogatory commission.  ECF Doc. No. 31-7, at 42-43.  The court considered the minutes of the April 6, 2011, hearing before the First Criminal Appellate Court and held that the First Criminal Appellate Court's ruling was "well considered on all complaints raised by the defendant."  ECF Doc. No. 31-7, at 42-43.

88. Based on the record below and the foregoing, the Second Criminal Appellate Court held that "[t]he seniority held by the defendant over the other members of the Board of Directors of BTR, given by his mere position within Bayindir Holding, represented the determinant factor for the success of the instigation deeds, respectively, the assimilation, by the co-defendants, of the decision to illegally conclude the legal documents detrimental to the bank and the full execution of such a decision."  ECF Doc. No. 31-7, at 51-52. Further, the court held that the record shows "beyond a reasonable doubt that the defendant Kamuran Cortuk requested, and the president and vice-presidents of BTR accepted to guarantee the credits extended to Bayindir Group, by constituting, in violation of the banking regulations, the collateral deposits analyzed in the grounds of this decision."  ECF Doc. No. 31-7, at 52.

89. The court found that the record clearly showed that the Debtor was (i) the chairman of the board of directors of BTR's majority shareholder, Bayindir Holding, (ii) a member of BTR's board of directors, and (iii) was empowered with a "first degree of signature" of Bayindir Turizm, the recipient of the loans.  ECF Doc. No. 31-7, at 51.

90. Thus, the Second Criminal Appellate Court affirmed the lower courts' decisions, upholding the Debtor's thirteen-year sentence and the civil damages imputed against him (the "Second Criminal Appellate Judgment"). ECF Doc. No. 31-7, at 58-59, 61-62.

91. The Second Criminal Appellate Judgment concluded all direct means of appeal of the Judgment and rendered the Judgment, as modified by the First Criminal Appellate Judgment and the Second Criminal Appellate Judgment, final.

G.  Additional Appellate Practice

(i)    The Annulment Action

92. Though the Debtor exhausted all direct appeals of the Judgment, the Debtor's appellate filings continued by way of extraordinary and collateral appeals.

93.  On December 5, 2012, the Debtor filed an extraordinary appeal (the "Annulment Action") with the Criminal Appellate Court seeking to undo the Second Criminal Appellate Judgment for lack of service, claiming that he was improperly summoned at the address he provided in the notice of the second appeal - "Yesil Cimen Sokak, Polat Tower no. 4/256, Besiktas, 34394, Istanbul, Turkey."  ECF Doc. No. 52-1, at ¶ 81; ECF Doc. No. 52-29, at 2-3.  The Debtor argued that he should have been summoned at the postal number "12/256" instead of "4/256."  ECF Doc. No. 52-1, at ¶ 81 (citing ECF Doc. No. 52-29, at 2-3), the prior postal number being the same as used by the Debtor on a life insurance agreement to delineate his son's address.  *See* ¶ 69 above.

94.  Specifically, the Debtor argued that "due to new constructions erected in the street where [he] lived, another numbering was given and, in fact, the address where all subpoenas were issued until the time … became nr. 12."  ECF Doc. No. 52-1, at ¶ 81 (citing ECF Doc. No. 52-29, at 2-3).

95.  On September 30, 2013, the Criminal Appellate Court entered a judgment on the Annulment Action, holding the Debtor's petition to be groundless.  ECF Doc. No. 52-1, at ¶ 82 (citing ECF Doc. No. 52-30).  In so doing, the Criminal Appellate Court recognized that the Debtor was summoned at the address he himself had indicated in the file (with postal number 4/256) and by publication at the doors of the courts and the Local Councils, and that the Debtor was summoned at the second address he provided (with postal number 12/256) for the March 29, 2013 hearing.  ECF Doc. No. 52-1, at ¶ 82 (citing ECF Doc. No. 52-30, at 2-3).

96.  The Criminal Appellate Court also held that as the return of service stated for prior summoning of the Debtor returned with a note that the Debtor "is not known at the address," the subsequent methods used to summon the Debtor (on the Court's door and the Local Council's door) were the only methods available for service."  ECF Doc. No. 52-1, at ¶ 83 (citing ECF Doc. No. 52-30, at 3).

97.  The Criminal Appellate Court referred to information gathered from the representative in the Republic of Turkey of the International Chamber of Commerce London - Commercial Crime Services Division (I.C.C. - C.C.S.) as relevant to its decision.  ECF Doc. No. 52-30, at 3.  The court noted that the I.C.C. - C.C.S. advised that the Debtor "does not have an office for the very few business meetings that he attends in the offices of his lawyers and generally he meets with people in coffee shops and hotel receptions.  He does not go to

anyone's office, he never receives any document from anyone, but his driver meets the driver of the other person in a previously determined location and they exchange documents." ECF Doc. No. 52-30, at 3.

98.  For these reasons, the court concluded that the addresses were incorrect "due to the culpable and abusive behavior of the Debtor" and held that the Annulment Action was "groundless." ECF Doc. No. 52-30, at 3.

> (ii)     The First Collateral Appeal

99. A few weeks after filing the Annulment Action, on December 18, 2012, the Debtor filed an action before the Criminal Trial Court under case no. 59368/299/2012 (the "First Collateral Appeal") challenging the international search warrant and European arrest warrant issued against him after the entry of the Second Criminal Appellate Judgment. ECF Doc. No. 74-1, at 1-2.  The Debtor argued that the warrants issued against him were unfounded because they were issued under Article 420 of the Criminal Code, applicable to Romanian defendants, and that the warrants should have been issued under Law 302/2004 as he was not located in Romania.  ECF Doc. No. 74-1, at 1-2.  In Criminal Sentence 140 of February 19, 2013, the lower court agreed that an initial warrant was issued under Article 420 after the Second Criminal Appellate Judgment, but reasoned that when the Criminal Investigation Service learned that the Debtor fled Romania for Turkey, new warrants were correctly issued under Law 302/2004.  ECF Doc. No. 74-1, at 3.  The Criminal Trial Court thus rejected the First Collateral Appeal.  ECF Doc. No. 74-1, at 3. The Debtor appealed to the First Criminal Appellate Court, which dismissed the appeal as groundless in Criminal Decision 644 of May 16, 2013.  ECF Doc. No. 74-1, at 3.

> (iii)     The Second Collateral Appeal

100. On February 3, 2014, the Debtor filed an action before the Criminal Trial Court seeking annulment of his conviction on the basis that the charges of which he was convicted were decriminalized under a new law that modified the definition of "public servant."  ECF Doc. No. 74-2, at 1-2.  On February 5, 2014, the Debtor also filed an appeal of the Judgment requesting a reduction of his sentence under a subsequently enacted criminal law providing for a more lenient sentence.  ECF Doc. No. 74-2, at 1.  These two appeals were joined under case no. 3946/299/2014 (the "Second Collateral Appeal").  ECF Doc. No. 74-2, at 1.  In the Criminal Sentence 162 of February 18, 2014, the Criminal Trial Court rejected the Debtor's appeal for annulment, holding that despite the modification in the statute, "[i]t may easily be found that the [new] provisions of art. 175 par. 2 of the Criminal Code apply to the [Debtor], i.e., he is exercising a public interest service, his activity being subject to the control and supervision of public authorities."  ECF Doc. No. 74-2, at 2.  The Criminal Trial Court also reduced the Debtor's conviction, on the basis of the new, more lenient law, from 13 years to 10 years and 6 months.  ECF Doc. No. 74-2, at 2.

101. The Debtor appealed the lower court's decision on various grounds, which were rejected by the First Criminal Appellate Court in its Criminal Decision 455 of May 6, 2014. ECF Doc. No. 74-2. The court found as ungrounded the Debtor's argument that he was not properly summoned by the lower court, holding that the Debtor's summoning was effective as evidenced by the Debtor's filing of written conclusions. ECF Doc. No. 74-2, at 4. The court also held that, contrary to the Debtor's argument, the prosecutor did not need to participate in the hearing on the annulment request per Romanian law. ECF Doc. No. 74-2, at 4. The Debtor's third appellate ground was based on the failure of the lower court to communicate the decision to him in Turkish, an argument which was held to be "unfounded" because, among other things, the Debtor's listed domicile was Dragomir's law office. ECF Doc. No. 74-2, at 5. The appellate court also rejected the Debtor's arguments that the lower court did not adequately address the merits of his challenge, holding that the modified law also encompassed his role as a "public interest person." ECF Doc. No. 74-2, at 5-7. Accordingly, the First Criminal Appellate Court dismissed the Debtor's appeal as ungrounded.

(iv)      The Third Collateral Appeal

102. On February 20, 2019, the Debtor filed yet another appeal of the Judgment before the Criminal Trial Court under case no. 4680/299/2019 (the "Third Collateral Appeal").

103. The Debtor's counsel, Dragomir, advised the Criminal Trial Court that the Debtor was unable to attend the hearing held on June 4, 2019, due to his age and "since over the last 5 years he has been staying in a trauma recovery centre in the [United States]." ECF Doc. No. 74-2, at 2.

104. The Debtor sought annulment of his sentence on the basis that some of the facts that form the basis of the conviction fell outside the scope of the crime of abuse of office as narrowed in 2016 by a decision of the Constitutional Court of Romania ("CCR") only to violations of primary legislation (laws and ordinances), while his purported violations of NBR rules and regulations constituted breach of secondary legislation (norms and regulations issued by competent authorities in the application of primary legislation) for which he could not be convicted under new provisions of Romanian law. ECF Doc. No. 74-3, at 1-2; 3-5. In Criminal Sentence 519 of July 12, 2019, the Criminal Trial Court dismissed the appeal as "unfounded," stressing that the Debtor was not only convicted for the breach of the NBR's rules and regulations but also for violating the Banking Law (primary legislation in the sense of the CCR's decision). ECF Doc. No. 74-3, at 7-9. Specifically, the court reasoned that the "illicit activity" for which the Debtor was convicted, including that the Debtor "caused the other defendants to fulfil their professional duties in a defective manner," consisted of violations of Banking Law. ECF Doc. No. 74-3, at 8-10. The Debtor subsequently appealed Criminal Sentence 519, which was dismissed by the First Criminal Appellate Court. ECF Doc. No. 74, at ¶ 5.

(v)      Petition to the European Court of Human Rights

105. On November 22, 2012, the Debtor submitted an Application to the European Court of Human Rights ("ECHR") claiming that the Romanian criminal proceedings were devoid of procedural guarantees, resulting in his wrongful conviction.   ECF Doc. No. 74-4. Specifically, the Debtor raised several of the same arguments raised in the Romanian criminal proceedings, including (i) that he was not properly summoned (see ECF Doc. No. 74-4, at 13-14); (ii) that the courts improperly determined that he was liable as a "public servant" under Romanian law by virtue of his position as BTR's board member (ECF Doc. No. 74-4, at 15-16); (iii) that the appellate courts improperly refused to consider the evidence he tendered (ECF Doc. No. 74-4, at 18-19); and (iv) that the proceedings were excessively lengthy under article 6 paragraph 1 of the Convention for the Protection of Human Rights (ECF Doc. No. 74-4, at 47-50).

106. On January 18, 2018, the ECHR entered a Ruling and dismissed the Debtor's Application (See District Court Case No. 3:18-cv-02626-BRM, at DE 22 Ex. B).

H.  The Civil Proceeding

107. On April 9, 2003, while the criminal investigations were pending against the Debtor and BTR's officers, BTR's liquidator filed a petition before the Seventh Commercial Section of the Court of Bucharest (the "Romanian Commercial Court") under the bankruptcy File No. 719/2002 seeking the patrimonial liability of BTR's administrators and BTR's main shareholders (the "Commercial Trial Case").   ECF Doc. No. 52-1, at ¶ 86; ECF Doc. No. 52-31, at 2.   The Commercial Trial Case was subsequently disjoined from the bankruptcy file under File No. 744/2003 (558/3/2003 in new format).

108. BTR's main shareholders included three Bayindir companies and the Debtor, who collectively held a majority interest in BTR.   ECF Doc. No. 52-31, at 2-3. The Debtor was also listed in the Petition as an administrator of BTR.   ECF Doc. No. 52-31, at 2.

109. The action for patrimonial liability sought to hold the defendants liable for the debts of the entity whose veil is pierced, in this case BTR, pursuant to applicable Romanian bankruptcy law.   ECF Doc. No. 42-2, at ¶ 29 & n.3.

110. BTR's Petition advised the Romanian Commercial Court that BTR's board members were under investigation as set forth in the Criminal Investigation File for "having committed the offence of abuse of office and intellectual forgery."   ECF Doc. No. 52-31, at 6.

111. The Debtor participated in the Civil Proceedings and opposed BTR's application against him.   *See* ECF Doc. No. 30-1 ¶ 11-13, Cortuk Certification dated April 16, 2019.

112. On March 23, 2004, the Debtor filed a request for a stay due to the existence of the Criminal Trial Case, arguing that its settlement would have decisive effect over the Commercial Trial Case. ECF Doc. No. 52-1, at ¶ 89. BTR opposed the Debtor's request for a stay on the basis that there was no identity of parties as the Commercial Trial Case entailed additional defendants—the main shareholders of BTR—that the Criminal Trial Case did not. ECF Doc. No. 52-1, at ¶ 89.

113. Due to several procedural actions and appeals, the Commercial Trial Court did not hear the merits of the Debtor's request for a stay until November 27, 2007, and entered a ruling on December 11, 2007, denying the request for a stay of the Commercial Trial Case. ECF Doc. No. 52-1, at ¶ 90.

114. On January 11, 2011, the Commercial Trial Court entered a judgment (the "Commercial Trial Judgment") rejecting BTR's petition for patrimonial liability against the Debtor, the main shareholders of BTR and all but two of its administrators. ECF Doc. No. 31-5, at 13.

115. The gravamen of the reasoning of the Commercial Trial Court was the Debtor was not a signatory on any of the fraudulent contracts, nor did he authorize them and, accordingly, he was not liable to BTR. ECF Doc. No. 30-1 ¶¶13 and 14, ECF Doc. No. 30-5, Commercial Resolution No. 78, pp. 7 and 13.

116. The Commercial Trial Judgment noted the Debtor's "chosen home address in Bucharest" as 6 Sapientei Street, first-second floor, apt. 3-5, sector 5. ECF Doc. No. 30-5, p. 13.

117. The Commercial Trial Court acknowledged that BTR suffered a "severe liquidities crisis" due to the Collateral Deposits. ECF Doc. No. 31-5, at 4-6. The Commercial Trial Court added that the "bankruptcy of BTR SA was determined by the investments as deposits in foreign banks, reported as term deposits and representing, in fact, collateral deposits constituted by BTR to guarantee certain credits granted to the group Bayindir by foreign banks." ECF Doc. No. 31-5, at 5.

118. The Commercial Trial Court further noted that the "fraudulent operations were performed by the management board of BTR SA which engaged the bank on those transactions, respectively by the signatures of the members of the management board." ECF Doc. No. 31-5, at 5. It added that the Debtor was "aware of the above-mentioned transactions, which determined the bankruptcy of BTR SA," and that "as chairman [of Bayindir Holdings] admitted that the group Bayindir was the beneficiary of the concerned amounts, respectively, as a member of the managing board of the bank, approved a false balance." Id.

I.    Appeal of Civil Judgment

119. BTR subsequently appealed the civil trial court's judgment to the Bucharest Court of Appeal - Sixth Civil Section ("Commercial Appellate Court") under File No. 5232/2/2011 (the "Commercial Appellate Case").  ECF Doc. No. 43-2, at ¶ 33.

120. BTR challenged the validity of the expert report presented, requested and paid for by the Debtor, on the ground that it went beyond its mandate of exclusively determining the damages of BTR, and also provided the expert's opinion as to the fault of the defendants, which the Commercial Trial Court incorrectly accepted.  ECF Doc. No. 42-5, at 6.  In so doing, BTR alleged, the Commercial Trial Court ignored all of the evidence administered and the actions taken by all of the other directors.  ECF Doc. No. 42-5, at 6.  BTR did not appeal the Commercial Trial Judgment's exclusion of the main shareholders of BTR.  ECF Doc. No. 42-5, at 5-6.

121. On October 28, 2011, BTR requested the Commercial Appellate Court to stay the Commercial Appellate Case in favor of the resolution of the Second Criminal Appellate Case pending before the Second Criminal Appellate Court.  ECF Doc. No. 42-2, at ¶ 33.

122. At the time, both the Second Appellate Criminal Case and the Commercial Appellate Case only entailed BTR's past administrators.  The Commercial Appellate Court granted BTR's request and stayed the Commercial Appellate Case on November 21, 2011.  ECF Doc. No. 42-5, at 7.

123. A few months after the entry of the Second Criminal Appellate Judgment, on August 2, 2012, BTR petitioned for the reinstatement of the Commercial Appellate Case and added to the record the Second Criminal Appellate Judgment.  ECF Doc. No. 42-2, at ¶ 34; ECF Doc. No. 42-5, at 7.

124. On October 10, 2012, the Commercial Appellate Court entered Civil Decision No. 1882/R (the "Commercial Appellate Judgment"), modifying the Commercial Trial Judgment by dismissing the claim of patrimonial liability against the Debtor and BTR's administrators and gave the Second Criminal Appellate Judgment res judicata effect.  ECF Doc. No. 42-2, at ¶ 36 (citing ECF Doc. No. 42-5, at 7 & 11).  In so doing, the Commercial Appellate Court held that under Romanian law, upon the "final and full settlement of the civil action, the criminal decision shall enjoy the authority of res judicata before the civil court."  ECF Doc. No. 42-5, at 8.

125. As BTR had the option of exercising its civil action under the criminal or civil route, the Commercial Appellate Court concluded that "following the submission of the civil action within the criminal trial, with the consequence of its settlement, as we have acknowledged

in full and in relation to all defendants, natural persons, directors of the debtor [BTR], the authority of res judicata is enforceable upon the civil trial."  ECF Doc. No. 42-5, at 9.

126. The Commercial Appellate Judgment afforded res judicata to the civil side of the Second Criminal Appellate Judgment, and "dismiss[ed] the action for patrimonial liability against the defendants natural persons."  ECF Doc. No. 42-5, at 10-11.

## IV.   LEGAL ANALYSIS and CONCLUSIONS OF LAW

### A.  Summary Judgment is Inappropriate at this Stage

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (made applicable to adversary proceedings pursuant to Fed. R. Bankr. P. 7056).   As the Supreme Court has indicated, "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action."  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (internal quotation and citation omitted).   At the summary judgment stage, the role of the court "is not to weigh evidence, but to determine whether there is a genuine issue for trial.  Knauss v. Dwek, 289 F. Supp. 2d 546, 549 (D.N.J. 2003), *citing* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, (1986).  In doing so, the court must construe facts and inferences in a light most favorable to the non-moving party.  *See* Am. Marine Rail NJ, LLC v. City of Bayonne, 289 F. Supp. 2d 569, 578 (D.N.J. 2003), *citing* Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp., 475 U.S. 574, (1986).

"The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact . . ."  Huang v. BP Amoco Corp., 271 F.3d 560, 564 (3d Cir. 2001), *citing* Celotex Corp., 477 U.S. at 323.  "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."  Horowitz v. Federal Kemper

Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995), *citations omitted*. Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., 475 U.S. at 586.

Here, each parties' motion for summary judgment is reliant upon the effectiveness of the Judgment. The Debtor contends that summary judgment is appropriate because, as a matter of law, the Judgment has no effect at all. The Liquidator contends that summary judgment is appropriate because the Judgment is not only effective, but its findings establish the non-dischargeability of the debt. This Court finds neither theory to be true as a matter of law. While the Judgment must be recognized as a valid claim, because the matter was not "actually litigated" collateral estoppel does not apply, leaving genuine issues of material fact as to the dischargeability of the claim.[3]

> B.  The Romanian Judgment is Entitled to Recognition by this Court pursuant to the Doctrine of Comity and the New Jersey Uniform Foreign Country Money-Judgments Recognition Act

The Debtor, in his Motion for Partial Summary Judgment, and Sakarya, in her Claim Objection, argue that the Judgment is invalid and cannot be recognized in the United States. The parties disagree as to the proper standard to apply in the Court's analysis for recognition of the Judgment. The Debtor claims the New Jersey Uniform Foreign Country Money-Judgments

---

[3] The Debtor's proposed conclusions of law states that "should the Court decide that the Liquidator's Criminal Judgment is valid and therefore a proper basis for BTR's Proof of Claim, there is no genuine issue of material fact as to the findings by the Romanian Courts. Accordingly, in such case, the Liquidator's Cross Motion would also be ripe for summary judgement. Therefore, one of the two parties is entitled to judgment under the present posture of this adversary proceeding." *See* ECF Doc. No. 67, p. 10. But the Debtor also proposed the conclusion of law that "it is evident that the Liquidator would not be entitled to partial summary judgment on the ground of collateral estoppel because the Criminal Judgment was not 'actually litigated.'" Id. Those two findings are at odds with one another, and after this Court's consideration of the filings, I find the former statement to be incorrect.

Recognition Act, N.J.S.A. 2A:49A-16 et seq. (the "Recognition Act") is applicable.  Because the

Liquidator failed to obtain recognition of the Judgment in the United States under the Recognition

Act, he argues that the Judgment is invalid.  The Debtor further contends that the Judgment would

not be recognized under the Recognition Act because it fails to satisfy the requirements of the

statute in that it denied the Debtor due process, imposes an unrecognizable penalty derived from a

criminal proceeding, and is in conflict with a judgment of the Romanian Commercial Court.  The

Liquidator disagrees.

The only authority the Debtor and Sakarya provide for their contention that the Liquidator

must recognize the Judgment under the Recognition Act is L'Institute Nat. De L'Audiovisual v.

Kultur Intern. Films, Ltd., 2012 WL 296997 (D.N.J. Feb. 1, 2012).  They argue that because the

plaintiff in that case sought enforcement of a French judgment under the Recognition Act's

predecessor statute in the district court, the Liquidator must follow the same statute for the

recognition of the Judgment.

The Liquidator argues that the doctrine of comity, not the Recognition Act, allows this

Court to acknowledge and apply the Judgment to its analysis.  She distinguishes the L'Institute

Nat. case on the basis that she is not seeking enforcement of the Judgment in this Court.  She is

not attempting to collect.  Her Motion for Partial Summary Judgment asks this Court to find the

Judgment non-dischargeable.  She seeks to use the findings of the Romanian Court as set forth in

the Judgment as proof of the elements needed to establish non-dischargeability and asks this Court

to apply principles of collateral estoppel to make the necessary findings.

But the Liquidator's argument fails to fully acknowledge the proof of claim she filed in the

Debtor's case.  Sakarya has challenged the validity of BTR's proof of claim as a whole, not the

non-dischargeable nature of the claim.  It also goes without saying that a legitimate claim must

exist before there can be any finding as to its dischargeability.  Additionally, in the event the trustee

appointed to administer the Debtor's bankruptcy estate is in a position to make a distribution to

creditors, BTR will be positioned to receive a payment.  In this way, BTR's proof of claim could

be considered an attempt to enforce the Judgment.  It would appear that, without recognition of

the Judgment, BTR may not be entitled to receive a distribution.

The Court notes that there is no federal statutory provision governing recognition or

enforcement of foreign judgments.  The Recognition Act sets forth the procedure for seeking

recognition as an original matter or in a pending action.  *See* N.J.S.A. 2A:49A-16.6(a) and (b).

Nothing in the Recognition Act requires that such matters be addressed only by a state court.  In

fact, the majority of federal courts hold that "[a]ctions to recognize and enforce foreign judgments

… are matters of state law." *See* Nicor Intern. Corp. v. El Paso Corp., 318 F. Supp. 2d 1160, 1163-

64 (S.D. Fl. 2004), *citing* Turner Entm't Co. v. Degeto Film, 25 F.3d 1512, 1520 n. 12 (11th Cir.

1994).   The Nicor Court, referring to the Restatement (Second) of Conflicts of Law, noted that

federal law might be applied where "application of a State rule on the recognition of foreign nation

judgments ... would result in the disruption or embarrassment of the foreign relations of the United

States." *See* Nicor, 318 F. Supp. 2d. at 1164.  But, in defending its decision to apply state law in

determining whether to recognize a foreign judgment, the Nicor Court cited decisions from two

other circuits that recognized the majority view.  *See* id., *citing* Phillips USA, Inc. v. Allflex USA,

Inc., 77 F.3d 354, 359 (10th Cir.1996) (finding view accepted by revised Restatement correct:

"[U]nless and until some federal statute or treaty declares otherwise, it is state, not federal, law

that governs the effect to be given foreign judgments."); Success Motivation Institute of Japan Ltd.

v. Success Motivation Institute, Inc., 966 F.2d 1007, 1009–10 (5th Cir.1992) ("Erie applies even

though some courts have found that these suits necessarily involve relations between the U.S. and

foreign governments, and even though some commentators have argued that the enforceability of these judgments in the courts of the United States should be governed by reference to a general rule of federal law.")

The Nicor opinion and the cases it cites involve diversity jurisdiction.  This adversary proceeding involves both federal question and diversity jurisdiction.  When a federal question is raised, federal courts apply federal law standards of comity to out-of-country judgments.  Pony Express Records, Inc. v. Springsteen, 163 F. Supp. 2d 465, 472 (D.N.J. 2001) ("[I]n cases brought on a federal cause of action, recognition of such foreign judgments in federal court may be based on the doctrine of comity"); Alfadda v. Fenn, 966 F. Supp. 1317, 1325 (S.D.N.Y. 1997) ("In cases involving federal questions, federal courts generally apply federal law to determine whether to recognize a foreign country judgment."); In re Ortega T., 573 B.R. 284, 291 (Bankr. S.D. Fla. 2017) (recognizing a foreign country judgment under principles of comity for purposes of collateral estoppel).

This Court finds that both comity and the Recognition Act apply here.  It further finds that the issue has been properly raised in this Court by both parties in accordance with the Recognition Act, making it ripe for decision.  The Recognition Act will be applied to determine whether the Judgment can be recognized for enforcement purposes in New Jersey.  Principles of comity will be applied to the decision of whether or not to recognize the Judgment for the purpose of determining whether collateral estoppel can be applied to the federal question of dischargeability.

The Debtor submits that the standards of comity and the requirements of the Recognition Act are substantially similar and that the same factors that he believes preclude enforcement of the Judgment under the Recognition Act, namely the lack of due process and the existence of conflicting judgements, also precludes the application of the doctrine of comity.  The Liquidator

claims that, although not required to do so for purposes of this argument, the Judgment satisfies the requirements for recognition as set forth in the Recognition Act.

(i)     The Doctrine of Comity

Courts consider the following factors to determine whether to afford comity to a foreign country judgment: (1) whether the judgment was entered by a competent court, having both personal and subject-matter jurisdiction; (2) whether the judgment was brought upon due allegations and proofs, giving the parties the opportunity to defend against the claims; (3) whether the judgment was entered in a clear and formal record; and (4) whether there is any special ground to impeach the judgment.  Pony Express Records, Inc. v. Springsteen, 163 F. Supp. 2d 465, 472 (D.N.J. 2001), *citing* Hilton V. Guyot, 159 U.S. 113 (1895).  The "polestar" consideration is "whether a reasonable method of notification is employed and reasonable opportunity to be heard is afforded to the person affected."  Somportex Ltd. v. Philadelphia Chewing Gum Corp., 453 F.2d 435, 443 (3d Cir. 1971); *see* Hurst v. Socialist People's Libyan Arab Jamahiriya, 474 F.Supp.2d 19, 34 (D.D.C. 2007) (federal courts may grant comity to foreign judgments entered following full and fair trial in foreign court of competent jurisdiction after proper service or voluntary appearance by defendant under judicial system that does not violate U.S. public policy), *citation omitted*.  In effect, basic notions of due process must be respected.  Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 314 (1950) (basic requirement of due process is proper notice that affords interested parties the opportunity to appear and defend).

Despite these considerations, "comity must yield to domestic policy" so that "no nation will suffer the laws of another to interfere with her own to the injury of her citizens." Republic of Philippines v. Westinghouse Elec. Corp., 43 F.3d 65, 75 (3d Cir. 1994), *quoting* Hilton v. Guyot, 159 U.S. 113, 164 (1895).  Therefore, "the obligation of comity expires when the strong public

policies of the forum are vitiated by the foreign act." Id., *quoting* Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 937 (D.C. Cir. 1984).

In Hilton v. Guyot, the United States Supreme Court defined comity as:

> … neither a matter of absolute obligation, on the one hand, nor mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.

159 U.S. 113, 141 (1895).

(ii)    Application of the Doctrine of Comity

The Liquidator, as the proponent of comity, bears the initial burden to prove that the Judgment is entitled to comity. *See* In re Neves, 570 B.R. 420, 427 (Bankr. S.D. Fla. 2017). Once the Liquidator meets her initial burden, the burden shifts to the party opposing comity to show that the order "violates American policy notions of what is decent and just." Id.; *see also* Tahan v. Hodgson, 662 F.2d 862, 864 (D.C. Cir. 1981) (comity may not be granted to a foreign judgment if its recognition would be "repugnant to fundamental notices of what is decent and just"). This burden is "high and unfrequently met" and is applicable only in "clear-cut cases." Ackerman v. Levine, 788 F.2d 830, 841 (2d Cir. 1986) (citations omitted).

(a) The Judgment Was Entered by a Competent Court, Having Both Personal and Subject-Matter Jurisdiction

It is uncontroverted that the Judgment was entered by the Romanian Criminal Trial Court. It is also uncontroverted that the Criminal Trial Court is a competent court in Romania. This Court finds that the Romanian courts had both personal and subject matter jurisdiction. As to subject matter jurisdiction, BTR was a Romanian banking institution, Debtor served on its board of directors, and held a minority interest in BTR. *See* Findings of Fact, ¶¶ 8 and 9. BTR suffered a liquidity crisis resulting from the foreclosure of several collateral deposits at foreign

correspondence banks and the National Bank of Romania ("NBR") took over its operations. *See* Findings of Fact, ¶¶ 10 and 11. NBR alleged fraud on the part of Debtor and other officers and directors of BTR as a cause of BTR's collapse. Findings of Fact, ¶ 12. The Romanian police then began investigations that resulted in an indictment against Debtor. Findings of Fact, ¶¶ 13 and 23. Clearly, the Romanian criminal courts had subject matter jurisdiction to hear allegations of fraud against a Romanian bank.

In determining whether the Criminal Trial Court had jurisdiction over the parties, the Court need not make a jurisdictional determination under Romanian law but need only satisfy itself that the Romanian Court had jurisdiction over the Debtor in an "international sense." *See* <u>Somportex</u>, 318 F. Supp. at 165. In <u>Somportex</u>, the district court analyzed under UK law whether a UK court had jurisdiction over the defendant where the defendant made a conditional appearance in the litigation and unsuccessfully appealed jurisdictional issue in the UK. *See* <u>id.</u> at 162. However, on appeal, the Third Circuit stressed that the Court need not examine whether the UK Court had jurisdiction under the UK long-arm statute. <u>Somportex</u>, 453 F.2d at 441. The defendant's appearance in the UK court was enough to satisfy this factor. *See* <u>id.</u>

In his certifications, Dragomir states that the service of process by the Romanian courts on the Debtor was invalid and that the Romanian courts did not have jurisdiction over the Debtor. Notably, in his initial certification where he explains Romanian service of process on foreign persons, Dragomir states:

"As it results from the provisions of the Criminal Procedure code, both the one in force in the reference period and the one currently in force, summoning is a procedure act whereby a person is called to appear before the criminal prosecution body or the court. Its purpose is to notify the relevant person that they are subject to criminal proceedings, for the application of the principles

of oral proceedings, immediateness and adversariality related to the requirement of securing the right to defense." ECF Doc. No. 50-16, ¶ 16. This statement tracks the notice required for comity to apply.

Debtor certified that he "… came to learn that in 2003, at the inception of the criminal proceedings, the Romanian Prosecutor's office served a summons on me, but it was at the wrong address, so the summons never actually reached him…[and that] if it had gone to my officially registered domicile address I would have received it." ECF Doc. No. 30-1, ¶ 1. In fact, it is uncontroverted that the Debtor was aware of the Criminal Investigation File at least as early as January 17, 2003, when he executed a power of attorney in favor of Dragomir and another lawyer, Christian Iordanescu, to represent him in connection with the Criminal Investigation File. *See* ECF Doc. 52-7. The Debtor's lawyers subsequently accessed the Criminal Investigation File and the expert report that was prepared.

The power of attorney was accompanied by a letter from Iordanescu to the General Prosecutor, identifying himself as "acting as the chosen defence lawyer of Mr. CORTUK KAMURAN." *See* id. In fact, Dragomir appeared in various hearings on behalf of the Debtor, and successfully argued for the revocation of a preventive arrest warrant against the Debtor.

The expansive record in the Criminal Trial Case and subsequent appeals demonstrates that the Debtor was served and appeared through counsel at the Criminal Trial Case establishing the Fpersonal jurisdiction of the court.

> (b) The Judgment Was Brought Upon Due Allegations and Proofs, Giving Debtor the Opportunity to Defend Against the Claims

Comity requires at a minimum, "notice reasonably calculated" to give the defendant an opportunity to defend. *See* DeJoria v. Maghreb Petroleum Exploration S.A., 804 F.3d 373, 387 (5th Cir. 2015) ("due process requires only reasonably calculated notice"); Farrow Mortg. Servs.

Pty. Ltd. v. Singh, No. CA-937171, 1995 WL 809561, at *2 (D. Mass Mar. 30, 1995); In re Transamerica Airlines, Inc., 2007 WL 1555734, at *9 (Del. Ch. 2007).

The Debtor had notice of the criminal proceedings against him long before the case was tried. His attorneys were given access to the investigative files. Dragomir provided addresses to serve the Debtor with notification of hearings and at a hearing held on January 21, 2004 argued that since the domiciles of the Debtor and other defendants were known, their presence before the court was not required. *See* ECF Doc. 52-11. The Debtor delivered a notarized letter to the Bucharest Court dated January 28, 2004, requesting the delivery of any future summons and acts of service issued to him in connection with the Criminal Trial Case to Dragomir's address. *See* ECF Doc. 52-19. Dragomir appeared before the Court of First Instance of District 1, Bucharest at a public hearing on January 21, 2004 to argue against the validity of the detention order issued against Cortuk in September 2002. *See* ECF Doc No. 52-11. He successfully argued a lack of due process, noting that the summoning procedure with regard to the hearing was not legally fulfilled. *See* id. In its decision vacating the detention order, the court noted that the Debtor and the other defendants were first summoned by posting notice on the door of the Local Council of District 1 Bucharest because addresses could not be found, but that the lawyers had now given the court their clients addresses. *See* id. at p. 4.

Numerous attempts were made to serve the Debtor with notice of scheduled hearings after the detention order was vacated. *See, e.g.*, ECF Doc No. 52-12. When the Debtor failed to appear at a hearing on January 18, 2006, the Bucharest Court noted that in his absence and the absence of "chosen counsel," the hearing would be adjourned until counsel could be appointed for him. *See* ECF Doc. No. 52-13. The criminal case against the Debtor and others was tried in April 2007, with court-appointed counsel present to represent the Debtor.

The Debtor next argues that he was not afforded an opportunity to defend himself and confront his accusers.  ECF Doc. No. 31-1, at ¶ 5; ECF Doc. No. 31-10, at 10; ECF Doc. No. 50, at 18.  But a party's participation in the foreign proceeding is not required for purposes of comity so long as a reasonable method of notification was employed to provide the party notice and an opportunity to defend.  *See* DeJoria, 804 F.3d at 387 (recognizing Moroccan judgment where defendant had not been in Morocco during proceeding); Somportex Ltd., 453 F.2d at 435 (recognizing UK judgment obtained by default under comity where defendant made conscious decision to not present a defense); Pony Express, 163 F. Supp. 2d at 471-75 (granting comity to UK judgment when parties did not participate in UK proceeding, but had opportunity to participate and "forewent that opportunity").

Finally, the Debtor contends that he was not notified of the Criminal Trial Case or the Judgment in compliance with a treaty for legal assistance between Romania and Turkey (the "Treaty").  The Debtor certified that the Treaty requires that an application for permission to serve a Turkish citizen be made to a Turkish court before process can be served for a foreign-country action.  But the Criminal Trial Court considered the same argument, as it was made by the Debtor's *ad litem* lawyer and found that the Treaty applied only in civil matters, not criminal ones.  ECF Doc. No. 52-17, at 3.  Debtor's expert on Turkish law agreed.  *See* 50-12, at 6 (citing to Article 6 of Treaty requiring judicial authorities in Romania and Turkey to "provide each other assistance in civil matters") (emphasis added).  But even if the Treaty applied, the Debtor failed to identify what portion of that Treaty applies or why the service was in contradiction of the Treaty.

For these reasons this Court finds that the Debtor was given the opportunity to defend against the claims, as he was aware of the proceedings.  Further, the Court finds that the Judgment was brought upon due allegations and proofs.  The *ad litem* attorney defended the case on the

Debtor's behalf.  The Romanian Courts, even without the appearance of a defendant, rendered a decision based about all evidence provided.  The Romanian attorneys retained by both the Debtor and BTR to offer their expert opinions confirm this.  ECF Doc. No. 52, at 25 (citing ECF Doc. No. 52-32, at ¶ 34-36; ECF Doc. No. 56-1, at 15.  This element of comity is satisfied.

### (c)  The Judgment Was Entered in a Clear and Formal Record

The Debtor does not dispute that the Judgment was delivered in a clear opinion or in a formal record.  Indeed, it is uncontroverted that the Judgment was delivered in a clear and thorough opinion and was published by the Romanian Criminal Court after due deliberation.

### (d)  There is No Special Ground to Impeach the Judgment

The Debtor presents two special grounds that he submits impeach the Judgment.  First, he challenges the integrity of the Romanian judicial system as a whole.  Second, taking a position inconsistent with his first argument, he argues that the existence of the conflicting Commercial Trial Judgment constitutes a special ground for impeachment.

As to the Debtor's general challenge to the integrity of the Romanian judicial system, courts in this country hold that the foreign judicial system need not be perfect; rather, the focus is "on the fairness of the foreign country's judicial system as a whole."  DeJoria, 804 F.3d 373, 381 (5th Cir. 2015); *see* Society of Lloyd's v. Ashenden, 233 F.3d 473, 476 (7th Cir. 2000); Chimexim, 36 F. Supp. 2d 206, 213-14 (S.D.N.Y. 1999).  Courts have recognized foreign country judgments despite due process deficiencies or lack of judicial independence.  *See, e,g*, DeJoria, 804 F.3d at 381 (recognized Moroccan judgment despite questions of judiciary's independence); Chimexim,

36 F. Supp. 2d at 213-14 (granted comity to Romanian commercial judgment despite imperfections in system because no material evidence that judicial system devoid of impartiality or due process).

In a research paper prepared for the Federal Judicial Center ("FJC") of the United States, the author noted that "courts have been quite liberal in their recognition and enforcement of foreign judgments. As a result, once the party seeking recognition of a foreign judgment has established the judgment's existence, the burden is generally on the party resisting recognition to prove grounds for non-recognition." Ronald A. Brand & Chancellor Mark A. Nordenberg, University Professor and Director, Center for International Legal Education, University of Pittsburgh School of Law, *Recognition and Enforcement of Foreign Judgments*, www.fjc.gov (April 2012). Here, the Debtor has not met this burden.

Those courts denying recognition of foreign judgments have done so based on findings of a complete absence of impartiality and due process. *See, e.g.* Bank Melli Iran v. Pahlavi, 58 F.3d 1406, 1412 (9th Cir. 1995) (court refused to recognize Iranian judgment as it was widely held that Americans could not get fair trial in Iranian courts, that Iran has deep hostility towards United States and its citizens, and Iranian judicial system incapable of affording adequate remedy); Bridgeway Corp. v. Citibank, 45 F. Supp. 2d 276, 287 (S.D.N.Y. 1999) (refusing recognition of Liberian judgment when litigation occurred while country was in "chaos" while during civil war, Constitution suspended, and judges served at direction of warring factions). These circumstances are not present here.

The Debtor raises a number of issues to support his argument that the Romanian Criminal Trial Court is flawed as a whole. He filed certifications prepared by Dragomir, that discuss "secret protocols" between the Romanian secret police and other governmental agencies that call into question the court system's evidence gathering mechanisms. *See* ECF Doc. No. 50-16, ¶¶ 50-67;

ECF Doc. No. 53; ECF Doc. No. 56-1.  In his initial certification, Dragomir references three Romanian decisions but does not include any copies of such decisions or, if copies were attached, they were not translated to English and were not readable by this Court.  Dragomir criticizes the procedures used in Romania for criminal prosecutions, quoting extensively from Decision 26, issued in 2019 by the Romanian "Constitutional Court."  *See* ECF Doc. No. 50-16, ¶¶ 17, 50-67. Both Dragomir and the Liquidator's expert agree that Decision 26 entailed only two such "secret protocols," which were deemed unconstitutional.  ECF Doc. No. 50-16, at ¶ 58; ECF Doc No. 57-5, at ¶ 7.

Dragomir refers to two more decisions, Decision 51 of 2016 and Decision 91 of 2018, and states that these decisions show that all Romanian entities involved in judicial procedures, including the NBR, entered into secret protocols "exclusively in criminal cases targeting investors and public authority persons" like the Debtor.  ECF Doc. No. 56-1, at 15.  Other than making this blanket statement, Dragomir does not present any translated copies of the decisions he cites or otherwise explain what these rulings entail.

The Court notes that, despite the voluminous copies of pleadings filed in the Romanian court attached as exhibits in this case, none include any argument about secret protocols.  Further, the Liquidator filed her own supplemental certification that countered Dragomir's allegation of secret protocols that this Court finds more convincing.  The Liquidator supplied a certification from another Romanian attorney, Alexandru Lefter.   ECF Doc. No. 57-5.  Lefter effectively distinguished the cases referred to by Dragomir and convincingly demonstrated their inapplicability.  Lefter advises that Decision 51 entails the validity of a certain part of a provision of the Criminal Procedural Code that lacked precision as to what state bodies can conduct measures that affect a high degree of intrusion, such as surveillance or warrant.  ECF Doc. No. 57-5, at ¶ 12.

He also explains that Decision 91 addressed a law that defined several situations that could be considered threats to national security and deemed certain situations, such as situations that affect "the fundamental rights and liberties of the Romanian citizens" as not specific enough. ECF Doc. No. 57-5, at ¶ 13-14.

Dragomir, who apparently has practiced before the Romanian criminal courts for many years, has a very low opinion of the courts in which he makes his living. He states, but provides no documentation, that he filed an application to vacate the Judgment due to the existence of the "secret protocols," and stated that the Debtor does not expect a favorable decision. He fails to provide any information as to how these "secret protocols" relate to the Debtor.

While the Debtor has not established the use of any "secret protocols" against him personally, he presents a report by the National Union of Romanian Judges ("U.N.J.R.") to further buttress his position that the "secret protocols" demonstrate that the Romanian judicial system is generally not impartial and lacks due process. ECF No. 50-7. The Report decried secret decisions that granted the Romanian Intelligence Service ("RIS") the authority to assist the Romanian Prosecutor's Office to battle cases entailing Romania's national security, which include corruption cases under a decision entered in 2005. ECF Doc. No. 50-7, at 6-7. The Report also protested the creation of "secret protocols" that laid out the assistance scheme by the RIS and requested their declassification. ECF Doc. No. 50-7, at 7-8. The Report complained of the implementation of anti-corruption efforts to oversee the judiciary "to guarantee fairness of justice and to prevent corruption among magistrates." ECF Doc. No. 50-7, at 5. While the Report highlights the problems with these secret agreements, it makes no determination that the entire judicial system is devoid of impartiality.

According to an article written by two of its members, the U.N.J.R. was founded in 2007 as an organization of young judges whose stated goals are, among other things, to promote the liberty and dignity of the judicial profession; strengthen the independence of justice; increase the effectiveness of justice; improve the image of the justice system; create a unitary practice and modernize the justice system; defend the independence of the judiciary; and promote respect in all circumstances for the judicial values of the rule of law, which recognize justice as a public service answering to the principle of transparency, and liable to the citizens. *See* Dragos Calin, Romanian Academy, Center for European Legal Studies, Legal Research Institute & Horatius Dumbravap, *The Evolution of the Judicial System in Romania During the Past 60 Years*, p. 131 (January 2009).

This Court finds that the fact that such associations as the U.N.J.R. exist in and are supported by Romania to promote the rule of law supports its conclusion that the doctrine of comity requires this Court's recognition of the Judgment.  The existence of such groups is inapposite to a finding that the Romanian judicial system "as a whole is so lacking in impartial tribunals or procedures compatible with due process so as to justify non-recognition of the foreign judgments." DeJoria, 804 F.3d at 382; *see* Bank Melli Iran v. Pahlavi, 58 F.3d 1406, 1409 (9th Cir. 1995) (citing various cases); Chimexim, 36 F. Supp. 2d at 214-15.

The Debtor cites to additional literature to support his position.  He relies on an article presented in an appeal, ECF Doc. No. 50, at 17-18 (citing to articles included in filing with the District Court related to an appeal of a ruling from this court under Case No. 3:17-cv-06949-FLW-LHG, at ECF Doc. No. 9-1), to advance the notion that Romania's conviction rate of nearly 100% shows that the Romanian judicial system "hardly comports with American edicts of 'innocent until proven guilty'" and that such conviction rate is inconsistent with an "impartial tribunal." ECF Doc. No. 49, at 5; ECF Doc. No. 50, at 20.  But, this article also highlights other aspects that afford due

process and impartiality, including: (i) "the Romanian judicial system does well in terms of delay and productivity"; (ii) that part of the reasons for the delays is the ability of the parties to conduct multiple appeals; (iii) that though "some corruption is present" the number of magistrates convicted for disciplinary and ethical violations "remains low"; (iv) that access to the judicial system is relatively easy and uncostly; (v) that unrepresented parties receive assistance. Case No. 3:17-cv-06949-FLW-LHG, at ECF Doc. No. 9-1, at 2-6.

He further cites to an article published by Dr. Martin Mendelski in February 2019, entitled "15 Years of Anti-Corruption in Romania: Augmentation, Aberration and Acceleration," in which the author finds that the Romanian "criminal system as a whole lacked integrity and deviated from principles of fairness." ECF Doc. No. 50-6, at 32. Dr. Mendelski admits that he voices a minority opinion; he concedes that "[m]ost academic literature presents Romania as a relative 'success story of Europeanization … This mainstream tale has been in line with various NGO reports … press coverage and the European Commission's monitoring reports which noted the improved 'track records' and overall progress in the fight against corruption." ECF Doc. No. 50-6, at 5. Again, the article is not sufficient to convince this Court that the Romanian justice system is so corrupt that its judgments are not entitled to recognition in the U.S.

This Court reviewed government reports about Romania prepared subsequent to issuance of the <u>Chimexim</u> opinion and found that, although none painted a picture of a perfect judicial system, they did not contain sufficient evidence of a system so impartial as to prevent recognition of a judgment entered by a Romanian court. *See, e.g.*, 2007 Country Reports on Human Rights Practices, Romania, Bureau of Democracy, Human Rights, and Labor (March 11, 2008), U.S. Department of State (2001-2009 Archives) (noting criticism of judiciary's oversight body but describing trial procedures such as right to counsel, confrontation of witnesses, access to

government-held evidence, and presumption of innocence); Country Reports on Human Rights

Practices for 2011, Romania, Bureau of Democracy, Human Rights, and Labor, U.S. Department

of State (noting constitutionally independent judiciary that is respected by government, but also

noting that system does not provide corresponding level of judicial accountability).

Further, this Court reviewed Congressional Reports on the Romanian legal system from

the U.S. Department of State and Reports from the Commission to the European Parliament and

the Council on Romania's Progress on accompanying measures following its acceptance into the

European Union.  The reports detail a legal system that had high levels of corruption and lack of

transparency that, along with numerous other economic, political, and military factors, initially

blocked Romania's entry into international organizations like NATO and the European Union (the

"EU").  *See* Report for Congress, NATO Applicant States: A Status Report, by S. Woehrel, J. Kim,

and C. Ek, CRS-26 (Updated April 25, 2003).  But Romania was invited to join NATO in 2002

and it became a member of the EU in 2007, demonstrating its commitment to improvement.  *See*

id. at CRS-1; europa.eu (an official website of the European Union).  To be invited to join NATO,

Romania had to demonstrate that it had a free market economy and a democratic political system

based on the rule of law.  *See* Report for Congress, NATO Applicant States, Summary.  Similarly,

membership in the EU required that Romania had achieved stability of institutions guaranteeing

democracy and the rule of law.  *See* Report from the Commission to the EU Parliament and the

Council, Brussels, June 6, 2007, COM (2007) 378 final, §4.1.

The Chimexim Court reviewed Romania's political history and discussed its court system

in detail, noting that Romania had approved a new constitution in 1991 that declared the country

a parliamentary republic and created reforms consistent with its new form of government.  *See*

Chimexim, 36 F. Supp. 2d. at 208.  Finding the judicial system sufficiently fair and impartial, the

Chimexim Court recognized a 1996 judgment entered by the Bucharest Tribunal, Commercial

Section.  *See* Chimexim, 36 F. Supp. 2d at 207-208, 213-216.  That judgment was entered long

before Romania was accepted into NATO and the EU.  In contrast, the Judgment in question here

entered in 2007, the year Romania was admitted into the EU and five years after Romania was

invited to join NATO.

　　　For these reasons this Court finds the Romanian criminal justice system to be sufficiently

impartial and that it provides adequate due process for recognition of the Judgment.

　　　The Debtor next argues that a judgment issued by the Bucharest Commercial Court

conflicts with that of the Romanian Criminal Court, providing a special ground to impeach the

Judgment.  This position is unavailing.   The Commercial Trial Judgment was not a final judgment.

Indeed, it is uncontroverted that on November 21, 2011, the Commercial Appellate Court stayed

the appeal of the Commercial Trial Judgment in favor of the second appeal of the Judgment.  ECF

Doc. No. 42-5, at 7.  Once the Second Criminal Appellate Judgment was entered in May 2012, the

Debtor had exhausted his direct appellate remedies, and the Judgment became final. It is further

uncontroverted that, shortly after the Judgment became final, the Commercial Appellate Court

resumed the appeal of the Commercial Trial Judgment, took notice of the finality of the Judgment

and entered the Commercial Appellate Judgment, which dismissed the claims against the Debtor

and BTR's administrators in favor of the civil award entered in the Judgment. *See* ECF Doc. No.

42-5, at 9-11. Thus, the Court finds that the Commercial Trial Judgment was not a final judgment.

　　　The Debtor's position that this Court should decide that the dismissed commercial case

should be entitled to deference over the Judgment is without merit.  There is no conflict: in

Romania, there is one single judgment.   There is no conflict because the Commercial Trial

Judgment was vacated.  This Court need not review the reasoning of the Romanian courts and will

not give the Debtor a second bite at the apple as to the decision to dismiss the Commercial Trial Judgment. *See* Hilton, 159 U.S. at 202-03 (the merits of a foreign judgment "should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or fact"); Somportex, 318 F. Supp. at 165 (agreeing that in conducting comity analysis the court need not look beyond the foreign judgment to examine its merits); In re Neves, 570 B.R. at 428 ("it is not the role of a United States court to review the factual findings of a foreign court"). There are no grounds to refuse recognition of the Judgment based upon this special circumstance.

(iii)    The Recognition Act

The Recognition Act requires that the foreign judgment be entered upon application of basic standards of fairness, i.e., whether due process was honored, whether the parties had a right to be heard and represented, and whether the foreign court's discretionary rulings were reasoned or arbitrary. *See* N.J.S.A.2A:49A-16.1, et. seq; L'Institute Nat. De L'Audiovisuel v. Kultur Intern. Films, Ltd., 2012 WL 296997 *2 (D.N.J. 2012). Acknowledgment of a foreign judgment under the Recognition Act is a pre-condition to its enforcement. It serves to domesticate a foreign judgment for collection purposes. *See, e.g.*, Guinness PLC v. Ward, 955 F.2d 875 (4th Cir. 1992) (Uniform Enforcement Act adopted to streamline and make uniform among states adopting it procedure for enforcing foreign judgments); Electrolines, Inc. v Prudential Assurance Co., 677 NW 2d 874, 882, 883 (Mich. Ct. App. 2003) (foreign money judgment cannot be enforced until it has been recognized; recognition is precursor to enforcement); Tonga Air Servs. v. Fowler, 826 P.2d 204, 214 (Wash. 1993) (foreign money-judgment must be recognized pursuant to Act before it can be enforced).

The principals of comity and the requirements of the Recognition Act are similar, but the Recognition Act contains certain specific requirements.  First, the Recognition Act applies to foreign country judgments that grant or deny a recovery of money and are final, conclusive, and enforceable under the law of the country where rendered.  *See* N.J.S.A. 2A:49A-16.3 (a).  But, even if the judgment grants or denies recovery of money, it does not apply to the extent the judgment is for taxes, fines, or other penalty, or is a judgment for divorce, maintenance, or is associated with a domestic relations case.  *See* N.J.S.A. 2A:49A-16.3 (b).

Second, the Recognition Act prohibits recognition of foreign country judgments in certain situations.  *See* N.J.S.A. 2A:49A-16.4 (b).  If the foreign court did not have personal or subject matter jurisdiction, or if the court is part of a judicial system that does not provide impartial tribunals or due process of law, the foreign judgment cannot be recognized.  *See* id.  The Recognition Act directs that the due process requirement meets the standards developed by the American Law Institute and the International Institute for the Unification of Private Law to govern resolution of International disputes.  *See* N.J.S.A. 2A:49A-16.4 (b) (1).  Of import to the facts before this Court, the Recognition Act states that "factual determinations by the rendering court concerning jurisdiction shall be binding on the defendant."  N.J.S.A. 2A:49A-16.5 (c).

Finally, the Recognition Act sets forth eight situations in which a court may exercise discretion in refusing to recognize a foreign judgment.  *See* N.J.S.A. 2A:49A-16.4 (c).  Most of the exceptions address issues similar to those addressed in the comity analysis set forth earlier in this decision.  Two exceptions require further discussion as they relate to the facts of this case.  *See* § IV (iv) (c) below.

(iv)    Application of the Recognition Act

(a) The Judgment Grants a Recovery of Money that Is Not a Tax, Fine or
Other Penalty, Nor Is It Associated with a Domestic Relations Case

It is not in controversy that the Romanian Judgment explicitly grants a money judgment in

favor of BTR and against the Debtor for a sum of money.  The Debtor and Sakarya argue that the

Judgment is not entitled to recognition because it constitutes a penalty.  *See* N.J.S.A. 2A:49A-

16.3(b)(2).

Though not in the context of the Recognition Act, the United States Supreme Court has

explained:

> The question whether a statute of one State, which in some aspects may be
> called penal, is a penal law in the international sense, so that it cannot be
> enforced in the courts of another State, depends upon the question whether
> its purpose is to punish an offence against public justice of the State, or to
> afford a private remedy to a person injured by the wrongful act.

Huntington v. Attril, 146 U.S. 657, 673-74 (1892); *see also* L'Institute Nat. De L'Audiovisual,

2012 WL 296997 at *3 (citing Huntington) (discussing the exclusion of a penalty from the same

Uniform Foreign Money-Judgments Recognition Act as that of New Jersey).

In Attrill, the Supreme Court examined a New York statute that imposed liability on an

officer of a corporation for the debts of the corporation if the officer signed and recorded a false

certificate of the corporation's capital stock.  Id. at 662-64.  Though the Court noted that the statute

might be considered penal as it imposed liability on the officer for the wrongful act committed, it

held that the statute was remedial, reasoning that "it gives a civil remedy, at the private suit of the

creditor only, and measured by the amount of his debt, it is as to him clearly remedial."  Id. at 676-

77 & 685.

Various courts adopted the reasoning in the Attrill decision, including courts in this district,

to grant recognition to foreign country judgments where the nature of the award was at issue.

L'Institute Nat. De L'Audiovisuel v. Kultur Int'l Films Ltd., No. 11-6309, 2012 WL 296997, *3 (D.N.J. Feb. 1, 2012) (following Attrill rationale noting that the "New Jersey Supreme Court has often relied on the [Attrill] rationale when making a determination of whether a foreign law is 'penal'"); *see also* Chase Manhattan Bank, N.A. v. Hoffman, 665 F. Supp. 73, 74-76 (D. Mass. 1987) (recognizing criminal judgment entered by Belgian court that included damage award to plaintiff arising from non-payment of bills); Hyundai Securities Co. v. Lee, 232 Cal. App. 4th 1379, 1387 (Ct. App. 2d Dist. 2015) (holding that Korean judgment ordering former executive to indemnify plaintiff for fine imposed on plaintiff by Korean government "was a damage award to compensate Hyundai for the damages it suffered from having to pay a fine," and not a fine or penalty); Harvardsky Prumyslovy Holding. A.S. v. Kozeny, 117 A.D.3d 77, 81, 82 (N.Y. App. Div. 2014) (applying N.Y. statute similar to Recognition Act to find money judgment awarded by Czech criminal court to victim where victim was state-owned corporation to be reparation to victim, not vindication of public justice).  These courts focused on the purpose of the classification and purpose of the judgment, not the court that issued the judgment. Hoffman, 665 F. Supp. at 74-76; Hyundai Securities, 232 Cal App. 4th at 1387-90; Kozeny, 117 A.D.3d at 80.

The Debtor attempts to distinguish these cases by arguing that here, "the public" invested in BTR, the bank kept those funds safe for their benefit, and allowed them to grow interest, therefore suggesting that BTR was a public entity that benefitted the public.  Even if BTR was considered a public entity, such classification does not render the monetary award "penal" in nature, as it is clear that BTR sought to enforce its private rights due to the monetary losses it suffered.  *See* Kultur, 2012 WL 296997, at *3.

Finally, the Court relies on the opinion of Alexandru Lefter, a Romanian lawyer who supplied certified explanations of Romanian law and procedure to the Liquidator.  *See* ECF Doc.

52-32.   Citing to the Criminal Procedural Code in effect at the relevant time periods, Lefter explained that the Romanian legal system provides for a civil action to be prosecuted along with a criminal action in front of the criminal court.   *See* id. at ¶17.   The criminal court will award damages in accordance with the civil law.   *See* id.   This is apparently what happened in this case.

Thus, the Court finds that the Romanian Judgment's monetary award in favor of BTR was issued to afford a private remedy to BTR for the wrongful acts committed by the Debtor.

### (b) The Judgment is Final, Conclusive, and Enforceable in Romania

It is uncontroverted that the Debtor exhausted his rights to appeal the Judgment, rendering the Judgment a final judgment.   The Court finds that the Judgment is final, conclusive, and enforceable.

### (c) The Judgment Does Not Invoke Any of the Exceptions Set Forth in the Recognition Act

The Recognition Act prohibits recognition of a foreign-country judgment if:

1) the judgment was rendered under a judicial system that does not provide impartial tribunals or procedures compatible with the requirements of due process of law, as determined by the court using standards developed by the American Law Institute and the International Institute for the Unification of Private Law to govern resolution of transnational disputes;
(2) the foreign court did not have personal jurisdiction over the defendant; or
(3) the foreign court did not have jurisdiction over the subject matter.

N.J.S.A. 2A:49A-16.4(b).   Based on its application of the principles of comity discussed above, the Court finds that none of these exceptions apply to the Judgment.   In addition to these mandatory exclusions to recognition, the Recognition Act lists eight discretionary exceptions that a court may apply to determine that a foreign country judgment will not be recognized.   *See* N.J.S.A. 2A:49A-16.4(c).   Apropos of the facts presented in the case before the Court, if the Debtor "…did not receive notice of the proceeding in sufficient time to enable [him] to defend," I may find that the

Judgment cannot be recognized.  *See* N.J.S.A. 2A:49A-16.4(c) (1).  But the Recognition Act also requires me to accept jurisdictional decisions made by the Romanian courts.  *See* N.J.S.A. 2A:49A-16.5 (c).  The Debtor raised the issue of lack of personal service by the Romanian courts claiming that he was not served at his correct address.  The Romanian courts consistently rejected the Debtor's position and found that he had been given due process and had been properly served.  They held that the Criminal Trial Court had jurisdiction.  This Court is statutorily bound by the findings of the Romanian Appellate Courts.

Another exception in the Recognition Act relevant to this action arises when "the judgment conflicts with another final and conclusive judgment."  *See* N.J.S.A. 2A:49A-16.4(c) (4).  The Debtor claims that the Commercial Trial Judgment conflicted with the Judgment.  The Court dismissed this claim earlier in this decision noting that the Commercial Appellate Judgment dismissed the claims against the Debtor and BTR's administrators in favor of the civil award entered in the Judgment.  For the reasons discussed above, the Court will not exercise its discretion to invoke this exception in the Recognition Act.

The remaining exceptions enumerate circumstances not raised by the Debtor, or which the Court has addressed in its analysis of comity as set forth above.  That analysis found that the Romanian judicial system provides due process and impartial tribunals.  Here, the Court further notes that, despite providing a number of different addresses for service to the Romanian courts, the Debtor certified that he was never served with the original summons and never received formal notice of the trial.  He does not dispute that he was aware of the investigation and that he retained Romanian attorneys to review the investigative files long before trial.  When attempts at mail and personal service failed, the Romanian court adjourned hearings to allow for alternate notice by posting on the door of the local council and the court.  It is curious that the public notices were not

seen or acknowledged by the Debtor's Romanian attorneys who apparently practiced in the same

courts in which the Debtor was prosecuted.   When neither the Debtor nor his Romanian counsel

appeared at a hearing, the Romanian court again adjourned the proceedings to allow time for

counsel to be appointed to act on behalf of the Debtor so that he would not go unrepresented.   The

Romanian Appellate Courts relied on these facts in reaching their finding that the Debtor was

properly served in accordance with Romanian law.

### (d) BTR Met Its Burden of Proving Recognition of the Judgment

This case presents facts that confuse the decision of where to place the burden of proof.   The

Debtor's Motion first raised the issue of nonrecognition in an attempt to block its use by BTR for

collateral estoppel purposes.   Therefore, it was his burden to prove nonrecognition.   *See* N.J.S.A.

2A:49A-16.6(c).   In its analysis of the collateral estoppel effect of the Judgment set forth below,

this Court treats the Judgment as akin to a default judgment.   The Recognition Act shifts the burden

of proof to the party seeking recognition where the foreign country judgment was entered "in

default of appearance of the defendant."   In the case of a default judgment, the party seeking

recognition has the burden of proving that the foreign court had jurisdiction and that the defendant

was served in accordance with the laws of the foreign country.   *See* N.J.S.A. 2A:49A-16.6(d).[4]   As

noted above, jurisdictional decisions rendered by the foreign court are binding on this Court.   *See*

N.J.S.A. 2A:49A-16.5(c).   Finally, the party seeking recognition of a foreign country judgment

has the burden of establishing that the judgment meets the requirements of the Recognition Act.

---

[4] It does not appear that Romania recognizes default judgments as they are known in this country.  The Liquidator submitted certifications from a Romanian lawyer, Alexandru Lefter, who opines that Romanian criminal law and procedure do not require the presence of the defendant in order to issue a judgment as long as the proper procedures are followed.  *See* ECF Doc. 52-32.  The Debtor submitted certifications from other Romanian lawyers, including Dragomir, that contradicted Lefter's opinion.  The Court finds Lefter's certification more persuasive.

*See* N.J.S.A. 2A:49A-16.3(c).   The Liquidator, while not admitting that the Recognition Act applies for purposes of determining whether it can be used to collaterally estop further litigation, nevertheless claims the Judgment meets the requirements of that statute, thereby raising the issue herself.   This Court will treat the Liquidator's Motion as an application for recognition of the Judgment and places the burden of proof on the Liquidator.   *See* N.J.S.A. 2A:49A-16.3(c).   The Court further finds that the Liquidator has met her burden and the Court recognizes the Judgment under the Recognition Act.   Finding both comity and the Recognition Act applicable and holding that this Court must give full faith and credit to the Judgment, the Debtor's Motion for Summary Judgment must be DENIED.

### C.  Sakarya's Claim Objection

Section 502 of the Bankruptcy Code controls the allowance of claims or interests in bankruptcy.  *See* 11 U.S.C. § 502.  Federal Rule of Bankruptcy Procedure 3001(f) provides that a properly filed claim constitutes prima facie evidence of the validity and amount of the claim.  Fed. R. Bankr. P. 3001(f).  An objection to a proof of claim may shift the burden of proof.  *See* United States v. Baskin and Sears, P.C., 207 B.R. 84, 86 (E.D. Pa. 1997).  This is concisely summarized as follows:

> A claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward.  The burden of going forward then shifts to the objector to produce evidence sufficient to negate the prima facie validity of the filed claim. It is often said that the objector must produce evidence equal in force to the prima facie case.  In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency.  If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence.

In re Graboyes, 371 B.R. 113, 119 (E.D. Pa. 2007), *citing* In re Allegheny Int'l, Inc., 954 F.2d 167,

173-4 (3d Cir. 1992) (citations omitted), In re Gimelson, 2004 U.S. Dist. LEXIS 23879, 2004 WL

2713059 at *13 (E.D. Pa. 2004), In re Galloway, 220 B.R. 236, 244 (Bankr. E.D. Pa. 1998). "A

bald assertion, a mere conclusory statement, is, in and of itself, insufficient to rebut the

presumption of validity." In re Hollars, 198 B.R. 270, 271 (Bankr. S.D. Ohio 1996).

As discussed above, the Claim Objection raised identical arguments as those presented in

the Debtor's Motion. Sakarya objected to BTR's Proof of Claim because the Judgment upon which

it is based was not recognized under the Recognition Act and could not otherwise be recognized

under the Recognition Act.

Accordingly, as determined above, the Judgment in favor of BTR is entitled to recognition

under comity principles and need not be recognized under the Recognition Act. Nevertheless, the

Court finds that the Judgment would be entitled to recognition under the Recognition Act. For this

reason, the Court OVERRULES Sakarya's claim objection.

### D.  Collateral Estoppel Cannot Be Used to Determine Dischargeability

To determine whether to afford collateral estoppel to findings of foreign country judgments

in connection with a federal cause of action, the Court must determine (i) whether the foreign

country judgment is granted comity; and (ii) if so, the extent to which the foreign country judgment

is entitled to preclusive effect. Pony Express, 163 F. Supp. 2d at 472; Alfadda, 966 F. Supp. at

1325; In re Ortega T., 573 B.R. at 291.

Having determined that the Judgment is entitled to recognition in this Court on the basis of

comity, the next step in the analysis is whether to grant the findings of the Romanian Criminal

Trial Court collateral estoppel effect in connection with Counts I, II and III of the Adversary

Complaint, which seeks a determination that BTR's claim is non-dischargeable. Collateral

estoppel is an equitable doctrine that prohibits the relitigation of issues that have been adjudicated in a prior lawsuit, and the principle applies in bankruptcy discharge proceedings. Grogan v. Garner, 498 U.S. 279, 284-85 n.11 (1991); In re Docteroff, 133 F.3d 210, 214 (3d Cir. 1997).   A majority of federal courts apply federal law to determine whether a foreign country judgment shall be given preclusive effect in connection with a federal claim. *See* Hurst v. Socialist People's Lybian Arab Jamahiriya, 474 F. Supp. 2d 19, 34 (D.D.C. 2007) (adopting majority view that federal standards apply in determining whether to grant preclusive effect to foreign country judgment); Pony Express, 163 F. Supp. at 472-74 (applying federal principles of comity to consideration of issue preclusion); Alfadda, 966 F. Supp. at 1329-30 (applying federal collateral estoppel law to determine in granting preclusive effect to French judgment); In re Ortega, 573 B.R. at 292 (adopting majority position that federal US law applies in determining issue preclusion of foreign country judgments). The Court will follow the majority of courts that have addressed this issue.

Collateral estoppel is applicable herein to the extent the facts established by the Judgment are relevant to the Court's determination of dischargeability under 11 U.S.C. § 523(a)(2)(a), (a)(4), and (a)(6). *See* Grogan, 498 U.S. at 284 (holding that collateral estoppel could be granted to "elements of a claim that are identical to the elements required for discharge and which were actually litigated in the prior action"); In re Docteroff, 133 F.3d at 215, *citing* In re Halpern, 810 F.2d 1061, 1064 (11th Cir. 1987) and In re Martin, 130 B.R. 930, 942 (Bankr. N.D. Ill. 1991).

In the Third Circuit, federal issue preclusion applies when (1) the issue sought to be precluded is the same as the one involved in the prior action; (2) the issue was actually litigated; (3) the issue was determined by a valid and final judgment; and (4) the determination was essential

to the prior judgment.  In re Docteroff, 133 F.3d at 214, *citing* In re Ross, 602 F.2d 604, 608 (3d Cir. 1979).

The Debtor contends that the Judgment should not be granted preclusive effect because it does not satisfy the first two requirements.  The Debtor argues that the issue of non-dischargeability was not litigated in Romania and that the findings BTR relies on to prove Counts I, II, and III do not satisfy the elements required to establish liability under those counts.  Because this Court finds that the matter was not actually litigated, collateral estoppel does not apply, and a determination as to the identity and essential nature of the issues decided need not be addressed.

The Debtor's primary contention with regard to collateral estoppel is that because he was not present at the initial criminal trial, and because the trial proceeded in abstentia, the matter was not "actually litigated" for the purposes of collateral estoppel.  The Liquidator submits that the participation of an *ad litem* attorney on the Debtor's behalf, as well as Dragomir's representation of the Debtor at various points throughout the proceedings, are sufficient to establish that the Debtor "actually litigated" the Criminal Trial Case and the First Criminal Appeal.

The Liquidator relies on Docteroff, a case that dealt with issue preclusion in the dischargeability context, in support of her position that the Judgment was "actually litigated."  ECF Doc. No. 52, at 24-25.  In Docteroff, the Third Circuit gave collateral estoppel effect to a district court judgment that was entered against the debtor by default as a discovery sanction for his bad-faith conduct.  *See* 133 F.3d at 215.  In so doing, the Third Circuit emphasized that "[t]his is not a typical default judgment where a defendant neglects or elects not to participate in any manner because of the inconvenience of the forum selected by the plaintiffs, the expense associated with defending the lawsuit, or some other reason."  Id., *citing* In re Bush, 62 F.3d 1319, 1324 (11th Cir. 1995).  Rather, the court found that the debtor "had every opportunity to fully and fairly litigate

any relevant issue" in the district court case, but he "simply elected not to comply with court orders." *See* 133 F.3d at 215. The court added that the debtor participated in the lawsuit by filing an answer, noticing discovery, engaging several lawyers, filing papers with the court, and corresponding with counsel. *See* id. The Third Circuit was resolute and did "not hesitate in holding that a party such as Docteroff, who deliberately prevents resolution of a lawsuit, should be deemed to have actually litigated an issue for purpose of collateral estoppel application." Id., *citing* In re Daily, 47 F.3d 365, 368 (9th Cir. 1995) (emphasis added).

The Liquidator places great importance on the language utilized by the Third Circuit that the debtor in Docteroff "had every opportunity to fully and fairly litigate any relevant issue," but "simply elected not to." 133 F.3d at 215. This abbreviated quote is used throughout the Liquidator's filings and fails to acknowledge the conclusion of the sentence that Docteroff "simply elected not to comply with court orders." *See* id. (emphasis added). This Court notes that the quote must be read in full and in its proper context. The Docteroff Court addressed the preclusive effect of a default judgment. There is a general rule that default judgments are not afforded collateral estoppel effect because the court issuing the judgment was not able to decide the issue in an adversarial context. *See* In re Pomeroy, 353 B.R. 371, 376 (Bankr. E.D. Mass. 2006).

The Docteroff quote relates to an exception to the general rule which has been developed in several federal courts. The exception provides that where a party substantially participates in litigation prior to the entry of the default judgment, collateral estoppel may apply to prevent the relitigation of those issues. In re Pomeroy, 353 B.R. at 377, *citing* Cornwell v. Loesch (In re Cornwell), 109 Fed. Appx. 682 (5th Cir.2004); Herbstein v. Bruetman, 32 Fed. Appx. 158 (7th Cir. 2002); Bush, 62 F.3d at 1324; In re Daily, 47 F.3d 365, 367 (9th Cir.1995); In re Jordana, 232 B.R. 469, 472 (10th Cir. BAP 1999) *aff'd* 216 F.3d 1087 (10th Cir.2000).

The partial quote from <u>Docteroff</u> relied upon by the Liquidator was not a finding that the exception applies in every instance where a debtor has the opportunity to litigate the issues fully and fairly.  The full quote confirms this.  The <u>Docteroff</u> decision was limited to a default judgment and was based upon the failure of the litigant to comply with court orders.  Accepting the Liquidator's broad reading would make the exception almost universally applicable.  In the vast majority of cases where a default has entered, the defaulted party has had the opportunity to litigate the issues, but for whatever reason has chosen not to.  Collateral estoppel does not apply in those cases because, "if failing to plead or otherwise defend gave the findings of fact in a default judgment issue preclusive effect, the exception would swallow the rule."  <u>In re Chavez</u>, 614 B.R. 874, 887 (Bankr. D.N.M. 2020).  Substantial participation is still a prerequisite for the invocation of the exception.

Thus, this Court's analysis is two-fold.  First, the Court must determine whether the Judgment may be considered analogous to a default judgment, or if the participation of the *ad litem* attorney on behalf of Debtor satisfies the "actually litigated" requirement.  If the Court determines that the *ad litem* process distinguishes the matter at bar from a traditional default judgment such that the matter was "actually litigated", no further analysis is necessary.  If the Court determines that the Judgment is more akin to a default judgment, then it must next determine if the representation at the inception of the cases and continued monitoring of the docket by Dragomir constitutes "substantial participation" such that the exception to applying collateral estoppel in a default setting should apply.  For the reasons that follow, this Court finds that neither the presence of a guardian *ad litem* nor Dragomir's participation allow it to give collateral estoppel effect to the Judgment on the issue of dischargeability in bankruptcy.

The Debtor cites to cases applying New Jersey state law which support the proposition that even where a litigant willfully declines to participate in a proceeding, or where a litigant is involved in prior proceedings and ceases to continue in the case, collateral estoppel does not apply. *See* In re Ehsan, 579 B.R. 722 (Bankr. D.N.J. 2018) (default for failure to respond to discovery following withdrawal of attorney not sufficient participation for collateral estoppel); In re Azeglio, 422 B.R. 490 (Bankr. D.N.J. 2010) (collateral estoppel not applied where debtor was unaware of trial date after participation in lawsuit); In re Moses, 2013 WL 3804721 at *7 (Bankr. E.D.N.Y. July 19, 2013) (review of the caselaw "suggests that New Jersey law would [not apply collateral estoppel] even if the defendant had notice and willfully declined to participate in the proceedings or participated to some extent.").

The Liquidator distinguishes these cases on the basis that they were decided applying New Jersey state law and not federal law, as is relevant here. However, she fails to provide any argument as to why the underlying reasoning is misplaced. Federal and New Jersey state law appear to be substantially similar regarding the application of the doctrine. *See* Gannon v. American Home Products, Inc., 211 N.J. 454, 471 (2012) (finding "essential elements" for state and federal test for collateral estoppel to be "quite similar"). This Court finds the cases to be supportive of the concept that, even if the judgment debtor engages in limited participation in the proceedings, collateral estoppel will not necessarily apply. There are certainly substantial distinctions between the cases cited to by the Debtor and the case presently before this Court. In Ehsan, the state court judgment contained no findings regarding the merits. The court there found even a cursory review of the case to raise significant questions as to whether the state court considered the issues sought to be precluded. Here, the Romanian court entered the Judgment with thorough reasoning. In Azeglio, the debtor was unaware of the trial date. Here, the record

conclusively demonstrates that the Debtor was aware of the ongoing prosecution of the case.  This knowledge does not impose a duty on the Debtor to ensure that he is properly served.  That duty lies with the prosecutor or plaintiff.  The larger point raised by the Debtor, that his non-participation in the criminal trial should preclude application of collateral estoppel, remains despite those differences.

The Liquidator provides Lefter's opinion that the Romanian criminal system does not have a concept of "default" judgment as provided under the common law.  ECF Doc. No. 52, at 21. Lefter explains that Romanian law requires that prior to entering a ruling, the judge must review all evidence presented with the aim of finding the truth, irrespective of whether a defendant has appeared or defended.  ECF Doc. No. 52, at 25 (citing ECF Doc. No. 52-32, at ¶¶ 34-36).  This is in line with Dragomir's perspective.  *See* ECF Doc. No. 56-1, at 15 (noting that "[i]n making the decision on the existence of the crime and the guilt of the defendant, the court decides motivated [sic], with reference to all the evaluated evidence.").  The burden of proof in a criminal case, as agreed by both parties, is "beyond any reasonable doubt."  ECF Doc. No. 43-6, at ¶36; ECF Doc. No. 56-1, at 15.  As reflected in the minutes of the criminal trial, in the Judgment, as well as in the appellate decisions, the Criminal Trial Court reviewed the evidence before it, which included an audit report, testimony of witnesses, and other documentary evidence, in entering the Judgment.

While the Court accepts Lefter's representation that there is no "default" in Romania, the fact that a judge reviews all evidence with the aim of finding the truth prior to rendering a decision is not conclusive proof that a matter is "actually litigated."  Often times this Court will conduct a proof hearing or consider evidence without the participation of a litigant to find the truth and to ensure a fundamentally fair result.  But it does not mean that the matter was actually litigated for the purposes of collateral estoppel.  Collateral estoppel applies where a "judgment on the merits"

is entered "in an _adversarial_ context." _Slowinski v. Valley National Bank_, 264 N.J. Super 172, 182-83, (App. Div. 1993) (emphasis added). The _Slowinski_ case was decided under New Jersey state law, but the requirement of an adversarial decision appears to this Court to be equally relevant under federal law. A judge is a neutral party, not an adversarial one who is advocating for a specific position or finding. This distinction is an important one because the legal system is an adversarial system, based upon the ability of the parties to present and highlight facts and arguments which they deem to be important.

More persuasive to a finding that the matter was "actually litigated" is the existence of the court appointed _ad litem_ attorney representing the Debtor in the criminal case. It is uncontroverted that after Dragomir ceased his appearances during the Criminal Trial Case, the Debtor was represented by an _ad litem_ lawyer. It is also uncontroverted that the Debtor's _ad litem_ attorney represented the Debtor during various hearings, and presented arguments on his behalf, as reflected in hearing minutes and the Judgment. Further, it is uncontroverted that the Debtor's _ad litem_ attorney also represented the Debtor and made arguments on the Debtor's behalf during the trial. But the record shows that the _ad litem_ attorney was never in contact with the Debtor. The Debtor did not participate in his own defense.

So, there was a party advocating on the Debtor's behalf, which made the proceedings arguably adversarial. The question for this Court is whether there is an unstated requirement that the advocacy be by the party himself. There is an undeniable difference between a party directly participating on their own behalf and a court-appointed attorney doing so. On most occasions the party has the most direct knowledge of the facts and circumstances giving rise to the legal matter. An _ad litem_ attorney may endeavor to present a case with the evidence, information, and witnesses

available, however that attorney is almost uniformly operating at a disadvantage without the party's knowledge and participation.

With that understanding, it must be acknowledged that the Debtor here had every opportunity to participate, either through his chosen counsel or through the *ad litem* attorney. He made a conscious decision to abstain from participating, notwithstanding the fact that he was likely aware of the trial and the appearances of *ad litem* attorneys on his behalf. But this does not affect this Court's analysis. Litigants have the right to choose not to appear and suffer the consequences.

This matter is distinguishable from those cited by the Debtor because there was participation at the proceeding through which the Judgment was rendered. Yet the participation was not by the Debtor, but rather by an attorney appointed by the court on behalf of the Debtor. This Court finds the distinction to be significant enough to view the Judgment as akin to a default. Courts do not allow the application of collateral estoppel in "a typical default judgment where a defendant neglects or elects not to participate in any manner because of the inconvenience of the forum selected by the plaintiffs, the expense associated with defending the lawsuit, or some other reason." *See* In re Docteroff, 133 F.3d at 215. Upon review of the caselaw, this Court views the reasoning for this general rule as an acknowledgement that a party's calculus as to whether to defend an action includes the knowledge of the consequences that might occur through a judgment in that action only. It should not foreclose that party from adjudicating the merits if, in the future, there are additional consequences in a different lawsuit which were not fully contemplated at the time of the original action.

Here, Cortuk purportedly believed that he had not been properly served. That has been conclusively proven to the contrary. The Romanian courts found that the Debtor was given due process. However, even assuming that he was properly served, his calculus as to whether or not

to appear was limited to the Romanian criminal case. Although he may have been aware that an *ad litem* attorney would appear on his behalf, it is unlikely that his decision not to participate contemplated being foreclosed from discharging a debt in a bankruptcy in the United States. For this reason, due to his non-participation, the Court will consider the Judgment as similar to a default to the extent that it finds that the presence of the ad *litem* in and of itself does not satisfy the requirement for collateral estoppel that a matter was actually litigated.

But, as noted above, there is an exception to the general rule that allows for a default judgment to be subject to collateral estoppel where the party has substantially participated in the case. The Liquidator contends that even if the court considers the Judgment akin to a default judgment, the Debtor, like the debtor in Docteroff, "had every opportunity to fully and fairly litigate" the issues but "simply elected not to." In re Docteroff, 133 F.3d at 215. The Liquidator stresses that the Debtor made several attempts to delay the litigation, such as contesting service at every hearing which significantly delayed the process, and in deploying his counsel in ways that delayed the proceedings. ECF Doc. No. 52, at 26. Further, the Second Criminal Appellate Judgment found that despite his selective appearances, Dragomir and his law firm continued monitoring the case file, requesting access to the same during the Criminal Trial Case. ECF Doc. No. 31-7, at 56.

The standard for the exception to default judgment goes far beyond the incomplete, cherry-picked quote from Docteroff utilized by the Liquidator. For instance, in Docteroff the debtor "participated extensively in the lawsuit. He filed an answer, noticed [his adversary's] deposition, engaged several lawyers, including local counsel, filed papers with the court, and corresponded with opposing counsel. Apparently Docteroff realized the meritlessness of his position and decided to frustrate orderly litigation by willfully obstructing discovery." Id. (citations omitted).

The debtor "repeatedly and in bad faith refused to submit to properly noticed depositions or respond to numerous legitimate requests for the production of documents despite court orders and warnings." Id. at 213.  The district court made a finding that the "non-compliance with discovery rules and Court orders was the product of willfulness and bad faith." Id., *citing* Wolstein v. Bernardin, 159 F.R.D. 546, 552 (W.D. Wash. 1994).  The Third Circuit held that not allowing collateral estoppel, "would encourage behavior similar to Docteroff's and give litigants who abuse the processes and dignity of the court an undeserved second bite at the apple." Id. at 215.

Similarly, numerous other circuit-level decisions in which the exception applies are based upon default judgments that are the result of sanctions for failure to comply with discovery after extensively participating in the litigation. *See* In re Pomeroy, 353 B.R. at 377-381, *analyzing* In re Cornwell, 109 Fed. Appx. 682 (5th Cir.2004); Herbstein v. Bruetman, 32 Fed. Appx. 158 (7th Cir.2002); In re Docteroff, 133 F.3d 210, 215 (3rd Cir.1997); Bush, 62 F.3d at 1324; In re Daily, 47 F.3d 365, 367 (9th Cir.1995); In re Jordana, 232 B.R. 469, 472 (10th Cir. BAP 1999), *aff'd* 216 F.3d 1087 (10th Cir.2000).

Here, BTR alleges that the Debtor engaged in gamesmanship in providing his address for service, and that Dragomir continued to monitor the case.  Dragomir's involvement is unpersuasive as a reason to apply collateral estoppel.  Caselaw, including Docteroff, establishes various reasons that a party may not choose to engage in a lawsuit, such as "the inconvenience of the forum selected by the plaintiffs, the expense associated with defending the lawsuit, or some other reason." *See* In re Docteroff, 133 F.3d at 215.  The non-participation is not incongruent with also monitoring the case.

Nor do Debtor's pre-judgment acts support application of the doctrine.  The matter is readily distinguishable from Docteroff and its ilk.  In Docteroff it was the debtor's participation

which caused the delay that prevented an adjudication on the merits as a sanction. He had sufficient opportunity to present his case but elected not to comply with court orders. In this case the Debtor, through Dragomir, arguably caused some delay based upon service initially, but he did not appear in any great capacity and he certainly did not participate to the extent of the debtor in Docteroff, who engaged heavily in discovery and motion practice which caused delay. The Debtor here did not refuse to comply with court orders and was not sanctioned in any way. He simply did not appear. This Court cannot find substantial participation such that an exception applying collateral estoppel to a default judgment should apply here.

The Debtor's participation in the appellate process in Romania does not change the Court's analysis. The appeals occurred after the Judgment entered. The Liquidator seeks to rely on the findings of the Judgment. Thus, the Debtor's actions in prosecuting his appeal, though time-consuming, cannot have any effect on whether the issues upon which the Liquidator seeks to rely were "actually litigated."

Because collateral estoppel is not applicable here, there remain genuine issues of material fact as to the dischargeability of the Judgment, and for this reason the Liquidator's motion must be DENIED.

V.     CONCLUSION

The Court holds the following:

(i)     the Judgment is acknowledged pursuant the Recognition Act and the doctrine of comity;

(ii)     the Debtor's Motion is DENIED, the Claim Objection is OVERRULED, and that portion of the Liquidator's Motion seeking recognition of the Judgment is GRANTED;

(iii)    the Judgment cannot be used to collaterally estop the Debtor from litigating the

issue of dischargeability as to BTR's claim; and

(iv)    that portion of the Liquidator's Motion seeking summary judgment as to the non-

dischargeability of the Judgment is DENIED.

The Court will enter an Order consistent with this decision and will schedule a status

conference to discuss trial.

Dated:  8/30/21                                /s/Christine M. Gravelle_____
                                               United States Bankruptcy Judge